Harry E. HALVERSON, et al.,
Appellants-Respondents,

v.

VILLAGE OF DEERWOOD,
Respondent-Appellant,

Josephine Cuderman, Respondent.

Nos. 48259, 48287.

Supreme Court of Minnesota.

Aug. 13, 1982.

Lance J. Johnson, Inver Grove Heights, Crawford & Anderson, Donald L. Hoeft, West St. Paul, for appellants-respondents Halverson, et al.

Charles H. Shure, Jr., Crosby, for respondent-appellant Village of Deerwood.

Josephine Cuderman, pro se.

WAHL, Justice.

Harry E. Halverson and Daisy I. Halverson (the Halversons) brought an action in 1976 to quiet title to two parcels of real property located in the Village of Deerwood (Deerwood). Parcel A, upon which three of the Halversons' resort cabins are located, is held in title by Deerwood; and Parcel B,[1] upon which the Halversons' home is located, is a dedicated but unimproved street. Ap-

---

1. The description of Parcel A, the property upon which the resort cabins are located, is:

The portion of Lot Four (4) of Block Fourteen (14) of "Deerwood", according to the filed plat thereof, described as:

Beginning at the Northeast corner of said Lot 4 and running thence southeasterly along the easterly line thereof a distance of 83.44 feet; thence North 67° 14′ 23″ West 355 feet, more or less, to the shore of Serpent Lake; thence northeasterly along said shoreline to the Northwest corner of said Lot 4; thence easterly along the North line of said Lot 4 to the point of beginning.

The description of Parcel B, the land upon which the home is located, is:

That portion of The Drive in the Plat of Deerwood, according to the filed plat thereof, lying South of a line drawn from the Northeast corner of Lot 4 of Block 14 of the Plat of Deerwood East to the East Line of said The Drive, which is also the West line of Block 13 of the Plat of Deerwood, and North of a line drawn from the Southwest corner of Block 13 of the Plat of Deerwood westerly to a point on the East line of Lot 4 of Block 14 of the Plat of Deerwood located 83.44 feet southerly from the Northeast corner of said Lot 4.

peals to the court were first taken in 1977 from a judgment of Crow Wing County District Court which found (1) that the Halversons had not adversely possessed against and Deerwood was not estopped from asserting its ownership to Parcel A, on which the Halversons operated a part of their resort, but (2) that the Halversons had adversely possessed against and Deerwood was estopped from asserting its ownership to adjacent Parcel B. Subsequent to the commencement of the appeal, Deerwood and the Halversons entered into a stipulation of settlement that provided, among other things, that the Halversons would pay $5,895 for title to Parcel B, that they would pay up to $1,500 for Deerwood's costs, and that a survey would be conducted "according to the filed plat" to determine boundaries with respect to Parcel A and adjacent land. We remanded the case to the district court for entry of amended findings of fact, conclusions of law and order for judgment in accordance with the terms of the stipulation of settlement.

A panel of registered land surveyors, selected pursuant to the stipulation, concluded that, because critical dimensions and directional lines were missing on the plat of 1892, it was impossible to describe the lots in question "according to the filed plat." They provided instead a metes and bounds description of Parcel A and Parcel B as established by practical location.

The district court of Crow Wing County, in a judgment entered December 18, 1980, set aside both the report of the registered land surveyors and the stipulation of settlement because the boundaries were not determined according to the filed plat as required by the stipulation. Reviewing the original judgment and the district court's action on remand, we affirm in part and reverse in part.

To understand the issues involved, we trace in detail the history of ownership and use of the real property which is the subject of this appeal.

The plat of the Village of Deerwood was filed with the Crow Wing County recorder in 1892 and shows Block Fourteen to be comprised of 31 lots stretching along Serpent Lake. Deerwood acquired title to Lot Four by a warranty deed filed May 26, 1911. The Halversons acquired title to Lots Two and Three by a warranty deed from Edwin G. and Emma M. Blomen filed May 15, 1957, and later acquired title to Lot One by a deed filed December 20, 1965.

In February 1975, the Halversons sold Lots One, Two and Three on a contract for deed to Gunnar Peterson. In August 1975, Gunnar Peterson had a survey of the property prepared by Wallace F. Buckler. The Buckler survey showed three of the resort cabins operated by the Halversons to be on part of Lot Four (Parcel A) and the home that had been constructed by the Halversons in 1958 to be situated on the dedicated but undeveloped street located east of Lots Two, Three and Four (Parcel B).

*Parcel A :*

Parcel A is that portion of Lot Four of Block Fourteen north of the road that runs the length of Lot Four from Cross Road and The Drive down to Serpent Lake. Lot Four of Block Fourteen was purchased by the Village of Deerwood in 1911. From 1925 until the 1930's Lot Four was marked with a sign designating it as a public park. There were picnic tables and barbecue pits on both sides of the road. The public also used the beachfront both north and south of the road as a swimming beach.

Ed Blommen operated a resort on Lots Two and Three and in 1947 received permission from the Village of Deerwood to place a one-story wooden frame building on Lot Four, Block Fourteen. This decision was made at a meeting of the Village Council on March 3, 1947. As early as June 1947 three cabins were situated on Parcel A. The trial court concluded that one of the three cabins located on Parcel A was placed there pursuant to this permission. Between 1947 and 1956 the Blomens mowed the grass, raked the leaves and otherwise maintained Parcel A. A white picket fence ran from the lake along the north side of the road past the cabin located next to the lake.

The Halversons moved to Deerwood on June 1, 1956, after having purchased Lots Two and Three from the Blomens. At the time the Halversons purchased the resort in 1956 there were nine cabins, a shower building, a repair ship, a fish-cleaning house and a small building used as a temporary office located on the property. After purchasing the property the Halversons improved the cabins on Parcel A and added modern facilities to all of the cabins.

Blomen explained to the Halversons at the time of the sale that all of the resort cabins were located on the property being sold to them and that the south boundary of Lot Three was the north side of the road heading down to Serpent Lake.

The Halversons continued to cut the lawn and maintain the property north of the road. They also maintained the white picket fence running along the north side of the road as their south boundary line.

Tax records indicate that the cabins on Parcel A have been assessed and taxed as part of Lot Three since at least 1956. The Halversons have paid these taxes.

The trial court found that sporadic public use was made of Lot Four for swimming and as a picnic ground and trailer park after 1911, but that in recent years such activity was limited to that part of Lot Four south of Parcel A. No barbecue pits or picnic tables have been located on Parcel A since 1947. The Halversons maintained at trial that they had asked swimmers to leave the beach on Parcel A and the docks installed for resort use just off shore because it was private property. The Halversons also testified that public swimming took place on the beach area south of Parcel A.

*Parcel B*:

In 1958, the Halversons constructed a $25,000 house on what they thought to be the east side of Lot Three. The Buckler survey revealed that the house sits on land that is an unimproved street (The Drive) that had been dedicated by the original plat of the Village of Deerwood in 1892.

The Drive was used from 1892 to World War II by merchants for deliveries as a 14- to 16-foot-wide street. Prior to 1943, The Drive was also used when Serpent Road became impassable due to water. However, there is no evidence of the exact location of the streets as then used. It has never been officially vacated. It was used occasionally before 1972 to control weed-burning and, in 1970, for location of a waterline for the property to the east. Since 1974 no traffic has been observed proceeding along The Drive, nor has Deerwood attempted to open a street in the area.

The Halversons thought their home was being constructed on the east side of Lot Three. In clearing the land for construction they removed four or five trees, some of which were more than 1 foot in diameter. After the Halversons had leveled off the ground they found three cement pillars and a sewer pipe on the west side of the foundation that was utilized in connecting the house to Deerwood's sewer system. Deerwood also provided water service to their home.

While the Halversons were digging the foundation for their home, the then Mayor of Deerwood, Harold Ratvold, visited the site and told Mr. Halverson that building permits were not required in Deerwood and the Halversons should proceed with construction.

The Halversons maintained the yard around their home as well as a blacktopped driveway, which they constructed on the east side of the house, that extends to the north end of the house. Maintenance included mowing the lawn and clearing rocks for a distance of 30 or 40 feet north of the house.

In 1970, a new water line was put in between the Halversons' home and Josephine Cuderman's home to the east. The Halversons have maintained the property east of their home up to this water line, which is visible as a low spot in the ground. Since its construction the Halversons' home has been taxed as an improvement on Lot Two.

The trial court concluded that:

1. The Halversons are not entitled to judgment as to Parcel A, upon which the resort cabins are located, except for the east 20 feet of the north 83.44 feet of that parcel, as delineated by the Buckler survey, which is impressed with a private easement for the Halversons and their successors and assigns to permit reasonable curtilage to the home on Parcel B; and

2. The Halversons are entitled to judgment as to Parcel B, upon which their home is situated, subject to a public easement for maintaining, repairing or servicing any public utilities located within that parcel, and excepting the east 20 feet of Parcel B, which is to remain a public highway.

After the appeals had been filed, the parties entered into a stipulation of settlement on August 1, 1978, which provided with respect to Parcel B that:

1. The Halversons would pay Deerwood the sum of $5,895; and

2. Deerwood would agree to quitclaim its interest in Parcel B to the Halversons; and

3. Deerwood would join the Halversons in seeking an amended judgment whereby Deerwood would retain an easement over the easterly 20 feet of Parcel B "only for the purpose of ingress and egress by emergency vehicles."

With respect to Parcel A, upon which the resort cabins are located, the stipulation of settlement provided that each of the parties was to select a registered land surveyor and that the two registered land surveyors would then select a third registered land surveyor. The stipulation also provided that, after the survey had been conducted "according to the filed plat," Deerwood would quitclaim any interest it had in Lots One, Two and Three to the Halversons, and the Halversons would quitclaim any interest they had in Lot Four to Deerwood.[2]

A meeting was held on May 9, 1979, between counsel for Deerwood, counsel for the Halversons and the three surveyors selected. The stipulation of settlement provided that the parties would be bound by a majority decision of the surveyors. The Halversons contend that this meeting resulted in an amendment to the stipulation of settlement whereby the boundaries could be determined in a manner other than "according to the filed plat," thereby permitting boundaries to be determined by practical location. To support this argument they offer a letter dated May 15, 1979, and argue that, because this letter provides for a majority decision of the surveyors as to the boundaries, the surveyors are no longer obligated to determine the boundaries "according to the filed plat." This letter and another in the Halverson's Reply Brief are not a part of the trial record, nor were they presented before the district court at any time as evidence in any proceeding.

2. The stipulation of settlement stated in part:
III. The Village of Deerwood and Harry E. Halverson and Daisy I. Halverson jointly agree:
\* \* \* \* \* \*
C. to be bound by the *decision of a majority of the registered land surveyors* as to the true and correct boundaries of Lots One (1), Two (2), Three (3), and Four (4), Block Fourteen (14) of Deerwood, *according to the filed plat thereof*;
D. *upon decision of a majority of the registered land surveyors* as to the true and correct boundaries of Lots One (1), Two (2), Three (3) and Four (4), Block Fourteen (14) of Deerwood, *according to the filed plat thereof*:
1. the Village of Deerwood will convey by quit claim deed to Harry E. Halverson and Daisy I. Halverson, as joint tenants and not

as tenants in common, whatever legal title the Village of Deerwood may have in Lots One (1), Two (2), and Three (3), Block Fourteen (14) of Deerwood, *according to the filed plat thereof*;
2. Harry E. Halverson and Daisy I. Halverson will convey by quit claim deed to the Village of Deerwood whatever legal title Harry E. Halverson and Daisy I. Halverson may have in Lot Four (4), Block Fourteen (14) of Deerwood, *according to the filed plat thereof*, except, however, the east 20 feet of the north 83.44 feet thereof shall be impressed with a private easement for Harry E. Halverson and Daisy I. Halverson, their successors and assigns to permit a reasonable curtilage to surround the house erected to the east of Lot Four (4) on that portion of The Drive which was formerly a part of the street.
(Emphasis added.)

On August 4, 1980, the surveyors reported to the trial court, unanimously concluding that critical dimensions and directional lines missing on the plat of 1892 made it impossible to effectively describe the four lots in question "according to the filed plat."[3] They went on to describe the boundaries of Parcel A according to the technique of practical location and provided a metes and bounds description of Parcel A and Parcel B as established by practical location. The metes and bounds description of the three surveyors was the same as that survey admitted into evidence at trial which had been conducted by Wallace Buckler on August 7, 1975, to locate the boundaries of Lots One, Two and Three. The district court declared the report of the registered land surveyors and the stipulation of settlement to be null and void.

The appeal raises the following questions: (1) Did the trial court err in declaring the report of the registered land surveyors and the stipulation of settlement to be null and void? (2) Did the trial court err in finding that the Halversons had adversely possessed and the Village of Deerwood was estopped from claiming Parcel B? (3) Did the trial court err in finding that the Halversons had not adversely possessed and that the Village of Deerwood was not estopped from asserting its rights to ownership of Parcel A?

1. The Halversons contend that the trial court erred in declaring both the report of the registered land surveyors and the stipulation of settlement to be null and void. We disagree.

█ It is the duty of the trial court on remand to execute the mandate of this court strictly according to its terms. *Jallen*

v. *Agre*, 265 Minn. 578, 122 N.W.2d 207 (1963). The trial court has no power to alter, amend, or modify our mandate. *Tankar Gas, Inc. v. Lumbermen's Mutual Casualty Co.*, 215 Minn. 265, 9 N.W.2d 754 (1943).

We remanded the case to the district court "for the purposes set forth in the formal stipulations * * *." The stipulation to remand, entered into by both parties, provided that they would agree to a judgment based on a decision of a majority of three surveyors "as set out in the *provisions of the Stipulation of Settlement entered into by the parties*." (Emphasis added.) The stipulation of settlement provided that the boundaries were to be determined "according to the filed plat of the disputed property."

The trial court set aside the surveyors' report and declared the stipulation of settlement null and void because a determination of boundaries was to be made "according to the filed plat" and not according to practical location. The trial court stated:

The surveyors goal in this case was to determine the true and correct boundaries of the property according to the filed plat. The surveyors in the report stated that because of the missing plat data it was impossible to resort to scaling to determine boundaries. Instead they relied on the doctrine of practical location in their attempt to ascertain the boundaries. This action of the surveyors, although a good-faith attempt to perform their duties under the stipulation, was beyond the intent or expectation of the parties when they entered into the stipulation. Their difficulty or inability to determine the boundaries from the plat

---

**3.** The report of the registered land surveyors reads in part:

The plat of Deerwood dated January 30, 1892 lacked critical dimensions and direction of lot lines. Drafting of the plat was inaccurate in both linear and directional scaling. These inaccuracies made it impossible to resort to scaling where plat data was missing or conflicting. We concluded that this plat is erroneous as defined by Clark on Surveying and Boundaries, 3rd Edition, a treatise on the law of surveying and boundaries. Section 533 states " * * * where a map or plat is

erroneous, it of course cannot have controlling effect on the description of the property."

Because this plat does not furnish enough reliable data for a reasonable retracement of Lots 1 through 5, Block 14, the panel of Surveyors agreed unanimously to the use of *practical location*. There is a possibility that there could be adverse possession or long continued non-use by a municipality which may result in a municipality being estopped to deny the superior title of a private property owner to disputed property.

(Emphasis in original.)

was unanticipated by the parties. The decision of the surveyors to use practical location is also inconsistent with the intent of the parties since this doctrine necessarily requires the resolution of many issues normally beyond the scope of a surveyor's duties.

■ The decision of the trial court vacating the stipulation of settlement rests within the court's discretion, and its action "will not be reversed unless it can be shown that the court acted in such an arbitrary manner as to amount to an abuse of discretion." *Ryan v. Ryan*, 292 Minn. 52, 55, 193 N.W.2d 295, 298 (1971). The trial court did not abuse its discretion by declaring the report and stipulation to be null and void.

■ 2. The trial court found, as to Parcel B, that this case presents "a classic example of estoppel." We agree and do not reach the issue of adverse possession. A municipality, like a private owner, may be estopped. *Bice v. Town of Walcott*, 64 Minn. 459, 67 N.W. 360 (1896). Each case stands on its own sets of facts, *id.*, which must be proved by a fair preponderance of the evidence. The facts themselves must be clear, positive and unequivocal in their implications. *Eliason v. Production Credit Association of Aitkin*, 259 Minn. 134, 106 N.W.2d 210 (1960).

■ We recognize that municipal corporations are afforded an added degree of protection as regards their property:

> The doctrine of estoppel is not applicable to municipal corporations as freely and to the same extent that it is to individuals. When it is applied, the basis of application is usually not because of the nonaction of the officers of the municipality, but because they have taken some affirmative action influencing another, which renders it inequitable for the corporate body to assert a different set of facts.

*Village of Newport v. Taylor*, 225 Minn. 299, 306, 30 N.W.2d 588, 593 (1948) (quoting *Steele v. Fowler*, 111 Ind.App. 364, 373, 41 N.E.2d 678, 682 (1942) (citation omitted)).

■ Mere nonuser, a form of nonaction, is insufficient to provide a basis for estopping a municipality from claiming its interest in a dedicated street. The reason for the added protection afforded municipalities was stated by Justice Mitchell:

> The rights of the public are seldom guarded with the degree of care with which owners of private property guard their rights, and, consequently, acts or omissions which might weigh heavily against private persons cannot always be given the same force against the public. Moreover, streets, levees, and the like are often laid out on land acquired for or dedicated to such purposes with reference to future as well as present requirements, and therefore it is not legitimate to assume that the property has been abandoned merely because it has not yet been used by the public.

*Parker v. City of St. Paul*, 47 Minn. 317, 318–19, 50 N.W. 247, 248 (1891).

■ We set forth the general rule for estopping a municipality from asserting its interest in a dedicated street in *City of Rochester v. North Side Corp.*, 211 Minn. 276, 1 N.W.2d 361 (1941):

> [A]n estoppel arises where there is long-continued *nonuser* by the municipality, together with the *possession by private parties in good faith* and in the belief that its use as a street has been abandoned, and the erection of *valuable improvements* thereon without objection from the municipality, which has knowledge thereof, so that to reclaim the land would result in *great damage* to those in possession.

*Id.* at 279, 1 N.W.2d at 363 (quoting 25 Am.Jur., Highways, § 114) (emphasis added). In addition to the above four factors in *City of Rochester*, we added a fifth in *Village of Newport*: "[T]here must * * * be some affirmative or unequivocal act of the municipality which, in view of all the circumstances, induced a third person reasonably to believe in and to rely upon such act as constituting a representation of an intent in fact to abandon the street * * *." 225 Minn. at 307, 30 N.W.2d at 593.

In *State v. Marcks*, 228 Minn. 129, 36 N.W.2d 594 (1949), we articulated several affirmative acts which were factors we recognized in upholding the trial court's conclusion that the city was estopped from denying abandonment of a dedicated street. They included the location of telephone poles in the street, the placing of defendant's building on the tax rolls, the furnishing of utilities to the defendant's building, and the designation of substitute streets. *Id.* at 136, 36 N.W.2d at 598.

■ Here, evidence presented at trial established that (1) Deerwood's power pole servicing the Halverson home is on the platted street; (2) the Halversons have paid over $6,000 in property taxes on their home; (3) Deerwood provided water and sewer service to the Halversons; and (4) the mayor of Deerwood in 1958 informed the Halversons that no building permit was needed and that the construction could proceed.

At no time after the Halversons took possession of Lots Two and Three was Parcel B or any portion of the dedicated roadway known as The Drive used as a roadway by Deerwood. The Halversons constructed a valuable improvement, their house, on Parcel B in the good-faith belief that the location was part of their property, and they would suffer great damage should Deerwood be allowed to reclaim the property. The trial court's judgment as to Parcel B is affirmed.

■ 3. The Halversons contend, as to Parcel A, that Deerwood should be estopped from avoiding a determination of boundaries by practical location, which would place the Halversons' southern boundary just north of the road leading to Serpent Lake. We agree. The trial court, on remand from this court, correctly refused to determine the boundary between Lots Three and Four by practical location because such a determination was not permitted by the stipulation of settlement. The trial court, in its judgment entered April 3, 1977, also determined that the Halversons had not adversely possessed against Deerwood as to Parcel A. This too was correct. However, the trial court, in its initial judgment, failed to consider determining the disputed boundary by practical location. At that time, the trial court was not aware of the impossibility of determining boundaries according to the filed plat. In actions to determine adverse claims to the location of property, the trial court is empowered to determine practical boundary lines. *Neill v. Hake*, 254 Minn. 110, 117, 93 N.W.2d 821, 827 (1958). The issue of estoppel by practical location is before us, even though not expressly pleaded or argued, if the facts in the record show it and if estoppel has been pleaded and argued. *Schauland v. Schmaltz*, 252 Iowa 426, 431, 107 N.W.2d 68, 71 (1961). To avoid delay and the expense of further litigation, where a case has been fully developed at trial, we may determine any issues which are settled as a matter of law by the record. *Shell Oil Co. v. Kapler*, 235 Minn. 292, 301, 50 N.W.2d 707, 714 (1951). The record before us is complete, and, in view of the protracted nature of this particular litigation, we consider whether the rule of boundary by practical location through estoppel results in placing the southern border of the Halverson's property along the fenceline north of ·the road leading to Serpent Lake.

■ We have noted above the rules by which a municipality may be estopped from claiming rights to dedicated property. Where boundaries are in dispute, our case law specifies three methods for establishing the practical location of a boundary line:

(1) Acquiescence: The location relied upon must have been acquiesced in for a sufficient length of time to bar a right of entry under the statute of limitations.

(2) Agreement: The line must have been expressly agreed upon by the interested parties and afterwards acquiesced in.

(3) Estoppel: The party whose rights are to be barred must have silently looked on with knowledge of the true line while the other party encroached thereon or subjected himself to expense which he would not have incurred had the line been in dispute.

*Theros v. Phillips,* 256 N.W.2d 852, 858 (1977). We focus on estoppel as a basis for determining the southern boundary line of Parcel A.

The principles of estoppel *in pais* are normally invoked in cases where a landowner makes positive representation to his neighbors about the location of their common boundary. But, "estoppel [as it relates to boundary by practical location] requires knowing silence on the part of the party to be charged and unknowing detriment to the other." *Id.* at 859 (citations omitted); *see also Wojahn v. Johnson,* 297 N.W.2d 298, 304 n. 2 (1980).

Other jurisdictions have invoked estoppel under such circumstances. *McClintic v. Davis,* 228 S.C. 378, 90 S.E.2d 364 (1955); *Minear v. Keith Furnace Co.,* 213 Iowa 663, 239 N.W. 584 (1931); *Corey v. City of Fort Dodge,* 118 Iowa 742, 92 N.W. 704 (1902). In *Corey,* the Iowa court estopped the City of Fort Dodge because the city saw "a landowner tak[e] possession of a part of the street under an apparent claim of right, and, without dissent or objection permit[ted] him to go on for a long period of years improving the same with valuable buildings * * * which the successful assertion of public right will destroy or seriously impair." *Corey v. City of Fort Dodge,* 118 Iowa at 749, 92 N.W. at 706.

Deerwood concedes that it is subject to the doctrine of boundary by practical location. We have noted that governmental bodies are protected from claims of estoppel by the requirement that there be some affirmative and unequivocal act by the government that it abandoned the property in question. When considering boundary by practical location on the theory of estoppel, the governmental body receives the same protection, because it is required to have knowledge of the true boundary line and to have looked on silently while another made valuable improvements on the property. The requirement that the governmental body look on in silence, with actual knowledge, affords the governmental body that increment of protection against the loss of public lands that is provided in adverse possession cases.

If the Village of Deerwood had knowledge of the true boundary line and did not inform the Halversons, who suffered the expense of improvements which would not have occurred had they been aware that the line was not located where their predecessor told them it was located, then Deerwood will be estopped from denying the boundary as determined by practical location.

"Because the effect of a practical location is to divest one party of property that is clearly and concededly his by deed, the evidence establishing the practical location must be clear, positive, and unequivocal." *Theros v. Phillips,* 256 N.W.2d at 858.

In March 1947, Deerwood granted to the Halversons' predecessor a license to construct one cabin on Lot Four. The trial court found, and we agree, that the evidence supports the finding that this cabin was constructed on Parcel A pursuant to the license. At that time, Deerwood clearly had knowledge that the boundary to Lot Four lay north of where the three cabins currently sit.

■ The trial court assumed that in 1956, when the Blomens conveyed Lots Two and Three to the Halversons, the Halversons continued to operate the three cabins on Parcel A pursuant to an unterminated license. In this the trial court erred. The license granted in 1947 was revoked by the conveyance. "A license is ipso facto revoked by a conveyance by the licensee." 1A G. Thompson, Real Property, § 224, at 231–32 (1980). A license is a personal privilege and not assignable or transferable. *Cameron v. Chicago, Minneapolis & St. Paul Ry.,* 60 Minn. 100, 103, 61 N.W. 814, 815 (1895). From the time the Halversons acquired the Blomens' property in 1956, they operated the cabins on Parcel A without a license.

In 1947 and thereafter, Deerwood had knowledge of the northern boundary of Lot Four and remained silent while the Halversons incurred expenses by moving, remodeling and improving the three cabins on Parcel A. In addition, the Halversons main-

tained Parcel A and paid taxes for the buildings located on it. The evidence clearly and unequivocally shows that there has been knowing silence on the part of Deerwood and unknowing detriment to the Halversons. The Village of Deerwood is estopped from denying that the northern boundary of Lot Four has been determined by practical location.

Affirmed in part and reversed in part.

KELLEY, J., took no part in the consideration or decision of this case.