READS LANDING CAMPERS
ASSOCIATION, INC., et
al., Appellants,

v.

TOWNSHIP OF PEPIN, State of
Minnesota, Respondents,

and

Richard McCaleb, et al., Intervenors–
Defendants, Respondents.

No. C2–94–2133.

Court of Appeals of Minnesota.

June 6, 1995.

Review Granted Aug. 31, 1995.

Jerry Kellum, Winona, Patrick J. Nugent, Minneapolis, for appellants.

William L. Thomas, Lake City, for respondent Tp. of Pepin.

Hubert H. Humphrey, III, Minn. Atty. Gen., Donald A. Kannas, Asst. Atty. Gen., St. Paul, for respondent State of Minn.

George L. May, Hastings, for intervenors-defendants, respondents Richard McCaleb.

Considered and decided by CRIPPEN, P.J., and PETERSON and FOLEY,* JJ.

* Retired judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI,

## OPINION

PETERSON, Judge.

Appellant Reads Landing Camper's Association, Inc. began this action against respondent Township of Pepin, seeking a declaratory judgment that Pepin had abandoned sections of two streets in the unincorporated village of Reads Landing. Appellant Soo Line Railroad Company and respondent State of Minnesota were later added as parties. Respondents Richard McCaleb, et al., Reads Landing residents, intervened, seeking a declaratory judgment that the State of Minnesota owned land adjacent to the Mississippi River that had been created by dredging. On cross motions for summary judgment, the district court determined that Soo Line held title to the land adjacent to the river that had been created by dredging and that Pepin had not abandoned the street sections. This appeal is from the resulting judgment. We affirm.

## FACTS

The plat of Reed's Addition to Pepin, located in Read's Landing, was dedicated in 1870. The plat included Main and Reed Streets, which ran perpendicular to the river bank and ended at the river.

Appellant Soo Line Railroad Company, through its predecessors in title, acquired land in Reed's Addition. The land was bordered by the railroad tracks on the south and the river on the north. Main and Reed Streets crossed Soo Line's land. Since at least 1966, Soo Line has leased its land to various lessees. The property has been used for a campground, boat harbor, bait shop and refreshment stand. In 1991, appellant Reads Landing Camper's Association, Inc. (RLCA) obtained possession of the leasehold by an assignment and acceptance of an existing lease.

From 1929 through 1947, the United States Army Corps of Engineers dredged soil from the river bottom and deposited it along the shoreline. This created a new area of land between the original boundary of Soo

§ 10.

Line's land and the river. The parties dispute whether Soo Line or the state owns this land.

Respondents state that the public has used the new land as a beach and recreation area. Frank Biever, a Reads Landing resident, stated that during the 1950's, with permission from the Army Corps of Engineers, Reads Landing residents constructed a small craft harbor at the beach area created by the dredging. Respondents submitted evidence that Soo Line did not begin paying property taxes on the new area until 1988. Appellants submitted evidence that over the years, governmental organizations have issued permits and licenses to the railroad's lessees, which were using the disputed area for business purposes, and conducted inspections of their operations.

Appellants also argue that Pepin abandoned the sections of Main and Reed Streets that run from the railroad tracks to the river. Pepin admitted that a building was located on the section of Main Street at issue and that the building was on the Wabasha County tax rolls. Pepin's answers to interrogatories indicate that it did not maintain, plow, or repair the disputed areas of Main and Reed Streets. Pepin did request that RLCA remove a cable, picnic tables and trailers from Main and Reed Streets. But appellants allege that the trailers remain on the premises pursuant to licenses issued by the Wabasha County Public Health Department.

### ISSUES

I. Did the district court properly determine that Soo Line, as riparian landowner, owns the area of land created by dredging?

II. Did the district court properly determine that Pepin had not abandoned the sections of Main Street and Reed Street crossing the area created by dredging?

III. Did the district court properly award intervenors costs and disbursements?

### ANALYSIS

On appeal from a summary judgment, this court must review the record to determine whether any genuine issues of material fact exist and whether the district court properly applied the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). We must view the evidence in the light most favorable to the nonmoving party. *Id.*

### I.

■ Respondents argue that pursuant to the Submerged Lands Act, 43 U.S.C. §§ 1301–1356 (1988 & Supp. III 1991), the state has title to the land created by the Corps of Engineers' dredging. But the

effect of the Act was merely to confirm the States' title to the beds of navigable waters within their boundaries as against any claim of the United States Government.

*Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 371 n. 4. 97 S.Ct. 582, 587 n. 4, 50 L.Ed.2d 550 (1977). Because the dispute in this case is between the state and a private party, state law applies. *See id.* at 371–82, 97 S.Ct. at 587–93 (absent overriding federal principle, state law governs disputes about land beneath and bordering navigable waterways); *see also California ex rel. State Lands Comm'n v. United States*, 457 U.S. 273, 281–83, 102 S.Ct. 2432, 2437–38, 73 L.Ed.2d 1 (1982) (explaining *Corvallis* ).

■ In *State v. Slotness*, 289 Minn. 485, 486, 489–90, 185 N.W.2d 530, 532, 534 (1971), the supreme court held that a riparian landowner owned land he created by filling a submerged lakebed to the point of navigability. The court stated:

The riparian owner's title extends to the low-water mark. The state owns the bed of navigable waters below the low-water mark in trust for the people for public uses, which include commercial navigation, the drawing of water for various private and public purposes, recreational activity, and similar water-connected uses.

The riparian owner, in addition to his rights to the use of navigable waters as a member of the public, has other private rights as an incident to his ownership of the shoreland. His main right—on which other rights depend and which often constitutes the principal value of property so situated—is an exclusive right of access to

the water in front of his land. This right of access is the foundation for the rule that the riparian owner has a right to accretions and relictions in front of his land. *Id.* at 486–87, 185 N.W.2d at 532 (citations omitted).

We recognize that this case is distinguishable from *Slotness* because the land was created by dredging and filling done by a third party and was not necessary for the landowner to reach the point of navigability. These factual distinctions, however, provide no basis for concluding that the land created in this case is not owned by the riparian owner. We, therefore, conclude that *Slotness* controls this case.

As stated in *Slotness,* the main right of a riparian owner "is an *exclusive* right of access to the water in front of his land." *Id.* at 487, 185 N.W.2d at 532 (emphasis added). A conclusion that land created by a third party is owned by anyone other than the riparian owner would take from the riparian owner the main right of riparian ownership. Even if the riparian owner retained a right of access to the water, this access would not be exclusive and the riparian owner would lose the right of exclusive access. *See Hanford v. St. Paul & D. R.R.,* 43 Minn. 104, 112–14, 44 N.W. 1144, 1145–46 (1890) (right to improve, reclaim, and occupy submerged land out to point of navigability is riparian right recognized and protected by law as property that riparian owner cannot be deprived of without just compensation).

The dissent contends that the land created by dredging the Mississippi River near Reads Landing is the property of the state because the dredging was a sudden and artificial change in the shoreline and, under *State v. Longyear Holding Co.,* 224 Minn. 451, 467, 29 N.W.2d 657, 667 (1947), the doctrine of accretions and relictions does not apply when a change is sudden and artificial. In *Slotness,* however, the supreme court expressly declined to "extend the holding in *Longyear* beyond the unique situation upon which it was decided." 289 Minn. at 488, 185 N.W.2d at 533. The facts of this case differ significantly from *Longyear,* which involved a lake that was drained temporarily. *See Longyear,* 224 Minn. at 467, 29 N.W.2d at

667. We will not extend the holding in *Longyear* to this case.

The dissent contends further that *Slotness* is distinguishable from the present case because *Slotness* did not involve the artificial deposit of the lake bed itself upon the shore. *See Slotness,* 289 Minn. at 486, 185 N.W.2d at 532 (land in dispute created by artificial filling on lake bed). As we have stated, Minnesota law applies to this case. *See Corvallis,* 429 U.S. at 371–82, 97 S.Ct. at 587 (absent overriding federal principle, state law governs disputes regarding land beneath and bordering navigable waters). The dissent cites no authority under Minnesota law for its conclusion that the land created by dredging should be deemed vested in the state because the fill used to create the land was taken from the river bed.

## II.

█ Soo Line claims ownership of the sections of Main and Reed Streets going across the land created by dredging through the Marketable Title Act, Minn.Stat. § 541.023 (1990). The Act does not apply unless the party invoking the Act has " 'a claim of title based upon a source of title, which source has then been of record at least 40 years.' " *Foster v. Bergstrom,* 515 N.W.2d 581, 586 (Minn.App.1994) (quoting *Town of Belle Prairie v. Kliber,* 448 N.W.2d 375, 378 (Minn. App.1989)).

█ The deeds through which Soo Line acquired its property interest describe specific blocks and lots. Plat maps show that the blocks and lots in Reads Landing do not include the streets. Soo Line does not claim that its predecessors acquired their property interest before Reed and Main Streets were platted. *See Padrnos v. City of Nisswa,* 409 N.W.2d 36, 38 (Minn.App.1987) (party had no claim of title when property he purchased did not include unopened roadway), *pet. for rev. denied* (Minn. Sept. 23, 1987). Appellants argue that Pepin never platted the sections of street going across the area of land created by dredging. But a street that has been dedicated for public use and that ends at a body of navigable water continues over extensions of land created by artificial means.

*Moore v. Kuljis,* 207 So.2d 604, 610–11 (Miss. 1967). Since the plat map shows Main and Reed Streets running to the riverbank, Pepin was not required to plat the street sections going across the land created by dredging. Because Soo Line has no claim of title to Main or Reed Street, the Marketable Title Act is inapplicable.

Alternatively, appellants argue that Pepin is estopped from claiming an interest in the disputed sections of Main and Reed Streets because Pepin has abandoned those sections.

> A municipality, like a private owner, may be estopped. Each case stands on its own sets of facts, which must be proved by a fair preponderance of the evidence. The facts themselves must be clear, positive and unequivocal in their implications.

*Halverson v. Village of Deerwood,* 322 N.W.2d 761, 767 (Minn.1982) (citations omitted).

> The rights of the public are seldom guarded with the degree of care with which owners of private property guard their rights, and, consequently, acts or omissions which might weigh heavily against private persons cannot always be given the same force against the public. Moreover, streets, levees, and the like are often laid out on land acquired for or dedicated to such purposes with reference to future as well as present requirements, and therefore it is not legitimate to assume that the property has been abandoned merely because it has not yet been used by the public.

*Id.* (quoting *Parker v. City of St. Paul,* 47 Minn. 317, 318–19, 50 N.W. 247, 248 (1891)).

■ Estoppel may be asserted against a municipality when the following elements are present: 1) long-continued nonuse by the municipality; 2) possession by a private party in good faith and in the belief that the property's use as a street has been abandoned; 3) erection of valuable improvements on the property without objection from the city, which has knowledge thereof; 4) great damage resulting to the possessors if the municipality were allowed to reclaim the land; and 5) an affirmative or unequivocal act by the municipality which, in light of all the circumstances, induced a third party rea-

sonably to believe in and to rely upon the act as constituting a representation of the municipality's intent in fact to abandon the street. *Id.*

■ Here, the parties agree that a building encroaches on the disputed section of Main Street and that the building is on the Wabasha County tax rolls. Appellants allege that trailers are on the disputed area of Main Street pursuant to licenses issued by the County Health Department and that a recreational campground encroaches on the disputed street areas. Appellants also allege that government organizations have inspected and issued permits and licenses to businesses using the disputed area, but the evidence indicates that county or state departments, not the township, performed these acts. We conclude that the evidence was insufficient to show affirmative action by Pepin that would support the application of estoppel against the township. *See Halverson,* 322 N.W.2d at 764, 767–68 (estoppel applied when village placed power pole on platted street; homeowner paid taxes on home encroaching on street; village provided water and sewer service to home; and after visiting building site, mayor told homeowners they should proceed with construction); *State v. Marcks,* 228 Minn. 129, 136–37, 36 N.W.2d 594, 598 (1949) (estoppel applied when city located telephone poles in street; placed defendant's building on tax rolls; furnished utilities to building; and designated substitute street); *Village of Newport v. Taylor,* 225 Minn. 299, 305, 30 N.W.2d 588, 592 (1948) (nonuse coupled with failure to remove obstructions constructed by abutting property owners does not constitute abandonment).

### III.

■ The district court is granted broad discretion in awarding costs and its decision will not be reversed absent an abuse of discretion. *Cheyenne Land Co. v. Wilde,* 463 N.W.2d 539, 540 (Minn.App.1990).

> By intervention, a third party becomes a party to a suit pending between others. An intervener is liable for costs if he fails

to sustain his claim. He is entitled to recover costs if he prevails.

*State ex rel. Bergin v. Fitzsimmons,* 226 Minn. 557, 565, 33 N.W.2d 854, 858 (1948) (citations omitted).

The district court awarded costs and disbursements to intervenors because it concluded that intervenors had made a substantial contribution toward resolution of the abandonment claim. This decision was not an abuse of discretion. We note that the court also taxed costs and disbursements against intervenors for the claim on which appellants prevailed.

## DECISION

The district court properly determined that Soo Line, as riparian landowner, owned the land created by dredging. The court properly determined that Pepin had not abandoned the disputed areas of Main and Reed Streets. The court properly awarded costs and disbursements to intervenors.

**Affirmed.**

FOLEY, Judge (concurring in part and dissenting in part).

I concur in the majority's decision that the township did not abandon Main and Reed streets. I respectfully dissent, however, from the majority's conclusion that the Soo Line Railroad holds title to the land added between its prior shoreline property and the Mississippi River. I would hold that the State of Minnesota holds title to the property created by dredging the bed of the Mississippi River.

The Mississippi River is United States history. It is the history of Minnesota. It belongs to all the people—to the state in trust for all the people. As it passes the village of Reads Landing, the history of the river—of the early French explorers, the Mark Twain writings, and the beginning point of the territory and then the State of Minnesota—looms large in the recorded explorations of the upper Mississippi. The Song of Hiawatha, according to Oliver Wendell Holmes, was "full of melodious cadences." Whether of the Mississippi where the Sioux and Chippewa rode upon these waters, or in Maine with the Ojibwa and Algonquins, his words could very well apply to the land of sky blue waters: "By the Shining Big–Sea Water."

The spoils from the bed of this river created by artificial means—dredging—should not be reduced to a private campground by a tortured definition of the term "accretion," but should be declared owned by the State of Minnesota in trust for the people—open to all—to be enjoyed by all—in keeping with its history.

In Minnesota, title to shore lands abutting navigable waters extends in a limited fashion to the low-water mark, and absolutely to the ordinary high-water mark. *State v. Korrer,* 127 Minn. 60, 71, 76, 148 N.W. 617, 621, 623 (1914). The shore owner also possesses certain riparian rights incident to ownership of the shore land, such as use of and access to the water. *Id.* at 71, 148 N.W. at 621.

Title to the bed of the water below the low-water mark, however, is held by the state in its sovereign capacity, "for common public use, and in trust for the people of the state." *Id.* at 70, 148 N.W. at 621. The Submerged Lands Act provides:

> It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States * * * be * * * recognized, confirmed, established, and vested in and assigned to the respective States * * * in which the land is located.

43 U.S.C. § 1311(a) (1988). The riparian owner's use extends only "to any purpose not inconsistent with the public right." *Korrer,* 127 Minn. at 72, 148 N.W. at 622.

Pursuant to the doctrine of accretions and relictions, a riparian owner ordinarily gains a vested right to property added to shore land by the *gradual* recession of the water or the washing ashore of deposits from the water bed. *State v. Longyear Holding Co.,* 224 Minn. 451, 467–68, 29 N.W.2d 657, 667 (1947). But in *Longyear,* the court concluded that where the drainage of a lake was "sudden and artificial, accomplished through the agency and authority of the state," the doctrine of relictions was not applicable, and the

lake bed remained the property of the state. *Id.,* 29 N.W.2d at 667. Similarly, here, the dredging of the Mississippi River near Reads Landing was sudden and artificial. The river bed itself, below the low-water mark, was heaved up and deposited on the river bank. Under these circumstances, the right of the state to that land should be held inviolate.

I find *State v. Slotness,* 289 Minn. 485, 185 N.W.2d 530 (1971), cited by the majority, to be distinguishable. In *Slotness,* the state conceded that a riparian landowner had the right to artificially fill the edge of a navigable lake and thereby create new land out to the point of navigability. *Id.* at 488, 185 N.W.2d at 533. The state agreed that the rights in this newly-created land belonged to the riparian landowner, subject to the government's power to remove or reclaim the land without compensating the landowner if necessary to improve navigability. *Id.* at 488–89, 185 N.W.2d at 533.

*Slotness,* however, did not involve the artificial deposit of the lake bed itself upon the shore. *Id.* at 486, 185 N.W.2d at 532. In the Submerged Lands Act, the federal government recognized the states' title to "lands beneath navigable waters," including "all filled in, made, or reclaimed lands which formerly were lands beneath navigable waters." 43 U.S.C. § 1301(a)(3) (1988); 43 U.S.C. § 1311(a). Here, the land added between the Mississippi River and the Soo Line's land was formerly "beneath navigable waters." *See Marine Ry. & Coal Co. v. United States,* 257 U.S. 47, 61, 65, 42 S.Ct. 32, 33, 34, 66 L.Ed. 124 (1921) (land filled by United States was "made" land); *cf. California, ex rel. State Lands Comm'n v. United States,* 457 U.S. 273, 285–87, 102 S.Ct. 2432, 2439–40, 73 L.Ed.2d 1 (1982) (distinguishing "accretions" from "made" land). The land dredged artificially from the Mississippi River bed should be deemed vested in the state to be held in trust for the people.