Rosemary Sherlock OFFERDAHL, et al., Appellants,

v.

UNIVERSITY OF MINNESOTA HOSPITALS AND CLINICS, Respondent.

No. C4–87–297.

Court of Appeals of Minnesota.

Sept. 1, 1987.

Review Granted Oct. 28, 1987.

Reed K. Mackenzie, Hvass, Weisman & King, Minneapolis, for appellants.

David C. Hutchinson, Geraghty, O'Laughlin & Kenney, St. Paul, for respondent.

Heard, considered and decided by HUSPENI, P.J., and WOZNIAK and CRIPPEN, JJ.

## OPINION

WOZNIAK, Judge.

Appellants Steven and Rosemary Offerdahl appeal from a summary judgment entered in favor of respondent University of Minnesota Hospitals and Clinics (University). They claim the trial court erred in ruling that their medical malpractice action is barred by the two-year statute of limitations for bringing such actions. We reverse and remand.

## FACTS

In January or February 1972, Offerdahl began using a Dalkon Shield intrauterine device (IUD), which was placed in her body by a physician not affiliated with the University. About a year after the IUD was inserted, Offerdahl was hospitalized at the University complaining of lower abdominal pain which was believed to be due to pelvic inflammatory disease (PID). She was treated with medication, but the IUD was not removed.

On June 28, 1977, Offerdahl visited the University requesting that the IUD be removed because she was again experiencing lower abdominal pain. Before this visit, she had been to the University on two other occasions for routine pelvic examinations. After the Dalkon Shield IUD was removed, Offerdahl inquired about alternative birth control methods. She alleges that the physician recommended using a Copper 7 (Cu-7) IUD, assuring her that it was safe and that it would cause none of the problems she was experiencing with the Dalkon Shield. Offerdahl consented to

using the Cu-7 IUD which was inserted on August 9, 1977, by Dr. Patricia Felton, a resident physician at the University. The record is not entirely clear, but apparently Felton was also the physician who removed the Dalkon Shield and recommended the Cu-7 IUD.

Nine months later, on May 9, 1978, Offerdahl went to the University and requested that the Cu-7 IUD be removed. Because Offerdahl may have been pregnant, the IUD was not removed. She was asked to return a week later when the IUD would be removed, if the results of the pregnancy test were negative. Offerdahl was not pregnant, but she did not return to the University until January 28, 1979, when she was experiencing severe lower abdominal pain. The Cu-7 IUD was removed, and Offerdahl was hospitalized for treatment of PID.

Since her hospitalization in 1979, Offerdahl has continued to receive treatment for problems related to PID, problems which she alleges were caused or aggravated by the insertion of the Cu-7 IUD. She has been under the care of Dr. Theodore Nagel, a physician at the University. Offerdahl has had three surgeries to remove scar tissue, and her left Fallopian tube and ovary were removed during surgery on October 28, 1981.

Following this surgery, Offerdahl continued to see Dr. Nagel for fertility counseling, which she claims was necessary because of the conditions caused by PID. She became pregnant in 1983, and in September 1983, her care was transferred to another physician at another hospital where she gave birth to a son in February 1984. On June 18, 1984, Offerdahl commenced this malpractice action against the University Hospitals and Clinics,[1] alleging essentially that agents of the University had failed to disclose the risks associated with the insertion of the Cu-7 IUD and that the IUD should never have been inserted, given her history of PID.

---

1. Although the named defendant is the University of Minnesota Hospitals and Clinics, no such legal entity exists. The Regents of the University of Minnesota is the corporate entity of which the hospital and clinic are a division.

The University moved for summary judgment, arguing that the suit is barred by the two-year statute of limitations for bringing medical malpractice actions. The trial court granted the University's motion, explaining in an attached memorandum that because Offerdahl had identified a single act—insertion of the Cu–7 IUD—as the alleged malpractice, the cause of action accrued as of that date, August 9, 1977, and that Offerdahl's action was untimely, having been commenced more than two years after the cause of action accrued.

## ISSUE

Did the trial court err in applying the single act exception to the traditional termination of treatment rule?

## ANALYSIS

A motion for summary judgment may be granted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that no genuine issue of material fact exists and that either party is entitled to judgment as a matter of law. *Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn.1982). On appeal, this court must determine whether genuine issues of material fact exist and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium*, 281 N.W.2d 328, 330 (Minn.1979). We must view the evidence most favorably to the party against whom the motion was granted. *Grondahl*, 318 N.W.2d at 242.

An action against physicians or hospitals for medical malpractice must be commenced within two years of the date on which the cause of action accrues. Minn. Stat. §§ 541.01, 541.07(1) (1984). The legislature, however, has not spoken to when a cause of action for medical negligence accrues. Consequently, the courts have been left with the task of interpreting the statute and have adopted the rule that the cause of action for medical malpractice accrues when the physician's treatment for the particular condition ceases. *Grondahl*, 318 N.W.2d at 243. Disputed questions of material fact as to whether a plaintiff is barred by the statute of limitations are to be decided by a jury. *Id.*

The parties here have agreed that a genuine issue of fact exists as to when Offerdahl's treatment ceased and concede that summary judgment is not appropriate if this case falls within the traditional "termination of treatment" rule. The sole issue on appeal is whether the trial court properly applied what has become known as the "single act" exception to the termination of treatment rule. For reasons we discuss below, we believe the trial court erred in applying the single act exception.

The single act exception to the termination of treatment rule applies to a particular category of cases where the alleged tort consists of: (1) a single act; (2) complete at a precise time; (3) which no continued course of treatment can cure or alter; (4) and the plaintiff is actually aware of the facts upon which the claim is based; that is, the plaintiff is aware of the malpractice prior to the end of treatment. *See Murray v. Fox*, 300 Minn. 373, 376, 220 N.W.2d 356, 358 (1974) (explaining *Swang v. Hauser*, 288 Minn. 306, 180 N.W.2d 187 (1970)). If these four elements are satisfied, the cause of action accrues and the statute begins to run as of the date of the negligent act.

The trial court relied exclusively on Offerdahl's allegation of a single negligent act—that she was negligently advised to use the Cu–7 IUD. The single act exception, however, requires more than identifying a single act, and trial courts are cautioned to apply the exception only in those cases where all the elements are clearly satisfied. Here, on the record before us, the third and fourth elements have not been satisfied.

Offerdahl was being treated for prevention of pregnancy by use of an IUD. The treatment, however, did not include merely the isolated incident of advising the use of and undertaking to insert the IUD. Treatment consists not only of treating the original condition, but also all subsequent care and treatment essential to full recovery. *Schmit v. Esser*, 183 Minn. 354, 358, 236 N.W. 622, 624 (1931). "Where the phy-

sician is employed generally to treat and heal an injury, he owes the duty of giving continued care and treatment." *Id.*

Here, the insertion of the Cu–7 IUD on August 9, 1977, did not terminate treatment, but contemplated periodic evaluation at follow-up visits for gynecological care. Moreover, the treatment Offerdahl received after the IUD was removed was necessary to cure and relieve symptoms of pelvic inflammatory disease, a disease which she alleges was caused or aggravated by the presence of the Cu–7 IUD. Although the University argues that Offerdahl's treatment for PID was different from her treatment for the prevention of pregnancy, the affidavits of medical experts from both parties indicate that Offerdahl's treatment after the IUD was removed was for problems associated with using the IUD. The only question raised by the experts' opinions is when treatment for the injuries ceased: the University's expert states that Offerdahl was completely cured of all injuries related to the use of the IUD by October 1981, while Offerdahl's expert states that Offerdahl is permanently at risk for recurring bouts of pelvic inflammatory disease caused by the presence of the Cu–7 IUD.

The experts' statements clearly indicate that Offerdahl was being treated for medical problems associated with using the IUD. The IUD was, in turn, recommended as part of the treatment Offerdahl was receiving for the prevention of pregnancy. The supreme court has stated that the treatment should be viewed as a whole, "and if there occurred therein malpractice the statute of limitations begins to run when the treatment ceases." *Schmitt v. Esser*, 178 Minn. 82, 86, 226 N.W. 196, 197 (1929).

■■■ The single act exception is inapplicable here where the facts show that something more remained to be done to effect a cure and that Offerdahl's treatment following the removal of the IUD was necessary and essential to her full recovery. Accordingly, this case is governed by the traditional termination of treatment rule. When treatment ceases is a question of fact to be decided by a jury, *see Grondahl*, 318 N.W.2d at 244, and is measured from the date of the last treatment by a member of the University staff for the injuries associated with using the IUD.

**DECISION**

The trial court erred in applying the single act exception to this medical malpractice action. The matter is remanded for a trial to resolve the fact issue of when appellant's treatment terminated.

Reversed and remanded.

CRIPPEN, J., concurs.

CRIPPEN, Judge, concurring specially.

The position of the University rests on characterization of treatment of Rosemary Offerdahl as an effort to identify an appropriate birth control device. That treatment ended in August 1977. It was evident in 1978 that the treatment had produced problems. Efforts between 1978 and 1981, aimed at eliminating the consequences of alleged malpractice, do not toll the statute of limitations. *See Schmitt v. Esser*, 178 Minn. 82, 84, 226 N.W. 196, 197 (1929) ("It is true that, if there be but a single act of malpractice, subsequent time and effort to merely remedy or cure that act could not toll the running of the statute.")

This view of the case is invited by appellants' complaint. Although the complaint identifies early treatment contacts of Rosemary Offerdahl with staff of the University of Minnesota, it alleges that negligence was singularly in the form of insertion of an intrauterine device in August 1977. The trial court granted summary judgment because of this statement of appellants' claim, concluding that appellants had identified "a single act, insertion of the Copper 7 IUD, as the alleged act of medical malpractice."

Another result is reached if the treatment of Offerdahl is viewed somewhat differently. In June 1977, before the Copper 7 IUD was inserted, a course of treatment began to deal with symptoms of pelvic inflammatory disease. The initiation of this treatment is stated in appellants' com-

plaint. It is evident that there was a close relationship between this treatment and the effort to identify an intrauterine device that would not cause further symptoms of the disease. This treatment involved continuing care between 1978 and 1981, ending in several surgical procedures. Fertility treatment beginning in 1981 was also aimed at overcoming consequences of the disease Offerdahl had suffered. In the course of this treatment, appellants allege that one act, the identification and insertion of a birth control device, involved negligence. So viewed, the single act of negligence is part of a long course of treatment that ended less than two years before this action was commenced.

The record here permits the view that this case involves a single act of negligence in the course of a six-year series of contacts to treat symptoms of pelvic inflammatory disease. It is appropriate in light of the authorities cited in the majority opinion to conclude that appellants' cause of action accrued following the termination of this course of treatment by University staff. The single act exception has no application in a situation involving such a continuous course of treatment.