**Rosemary Sherlock OFFERDAHL, et al., Respondents,**

**v.**

**UNIVERSITY OF MINNESOTA HOSPITALS AND CLINICS, petitioners, Appellants.**

**No. C4–87–297.**

Supreme Court of Minnesota.

July 22, 1988.

David C. Hutchinson, St. Paul, for petitioners, appellants.

Reed K. MacKenzie, Minneapolis, for respondents.

POPOVICH, Justice.

Rosemary Sherlock Offerdahl sued the University of Minnesota Hospitals and Clinics (hereinafter "University"), alleging the University committed medical malpractice by failing to disclose risks associated with use of an intrauterine device (IUD) and for damages allegedly incurred as a result of insertion of the IUD. The district court granted the University's motion for summary judgment, holding Offerdahl's claim was barred under the applicable statute of limitations as more than two years had passed between the insertion of the IUD and commencement of this suit. The Minnesota Court of Appeals reversed and remanded, holding that the statute of limitations did not begin to run until the University's treatment of Offerdahl terminated, raising a jury question as to when treatment ceased. *Offerdahl v. University of Minnesota Hospitals and Clinics*, 411 N.W.2d 20 (Minn.App.1987). Because we find Offerdahl's claim is based upon a single act of negligence and the damage was sustained more than two years prior to the commencement of this action, we reverse.

I.

In 1972, Rosemary Offerdahl began using a Dalkon Shield intrauterine device (IUD) which was inserted by a physician at a community health service not affiliated with the University. Offerdahl attended the University of Minnesota as a student in 1973 and 1974. In 1973, she was hospitalized at the University Hospital for abdominal pain associated with Pelvic Inflammatory Disease (PID). The Dalkon Shield IUD was not removed at that time.

On June 28, 1977, Offerdahl visited the University Hospital complaining of abdominal pain and excessive bleeding during menstruation and the Dalkon Shield IUD was removed. After the removal, Offerdahl inquired about alternative methods of birth control. She returned to the University Hospital on August 9, 1977, and consented to the insertion of a Copper–7 IUD by Dr. Patricia Felton, a resident physician at the University. Offerdahl alleges Felton recommended the Copper–7, assuring her it was safe and would not cause the problems she had experienced with the Dalkon Shield. Offerdahl was instructed to return to the University in one year for a checkup and Pap smear.

Offerdahl continued to experience abdominal pain after the insertion of the Copper–7. On May 9, 1978, Offerdahl went to the University Hospital and asked to have the IUD removed. Because pregnancy was suspected, the IUD was not removed. Offerdahl was asked to return in one week for removal of the IUD if the results of the pregnancy test were negative. Although Offerdahl was not pregnant, she did not return to the University until January 28, 1979, when she was experiencing severe abdominal pain and vaginal bleeding and discharge. The Copper–7 IUD was removed and Offerdahl was admitted to the University hospital for treatment.

Offerdahl was diagnosed as having chronic PID. As a result she has undergone a number of surgeries, including the removal of her left Fallopian tube and ovary at the University in 1981. The parties dispute when treatment for PID ended at the University. Following the 1981 sur-

gery, Offerdahl received fertility counseling from Dr. Theodore Nagel, a physician at the University Hospital. In February, 1984, Offerdahl gave birth to a healthy baby.

Meanwhile, in 1982 Offerdahl commenced a lawsuit against A.H. Robins Company, Inc., for damages sustained as a result of using the Dalkon Shield IUD. This litigation was settled in 1984. She then commenced this medical malpractice action against the University on June 19, 1984. Offerdahl alleges the University was negligent because it failed to disclose to her the risks associated with the insertion of the Copper–7, including the increased risk of contracting or aggravating PID and associated complications. She further alleges the University was negligent in failing to advise her the Copper–7 manufacturer recommended against inserting the Copper–7 under the circumstances that existed when the IUD was inserted in Offerdahl.

## II.

The following issues are raised on appeal:

1. Whether Offerdahl's claim against the University is barred because more than two years had passed between treatment by Dr. Felton and the commencement of the lawsuit.

2. Whether Offerdahl's claim is barred under the "single act exception" to the "termination of treatment rule" applied to medical malpractice.

## III.

■ On an appeal from summary judgment, the role of the reviewing court is to review the record for the purpose of answering two questions: (1) whether there are any genuine issues of material fact to be determined, and (2) whether the trial court erred in its application of the law. *Minneapolis, St.P. & S.Ste. M.R.R. v. St. Paul Mercury Indem. Co.*, 268 Minn. 390, 406, 129 N.W.2d 777, 788 (1964). When reviewing a summary judgment, we "must take a view of the evidence most favorable to the one against whom the motion was granted." *Abdallah Inc. v. Martin*, 242 Minn. 416, 424, 65 N.W.2d 641, 646 (1954).

1. Claims for malpractice against physicians and hospitals must be commenced within two years of the time the cause of action accrues. Minn.Stat. §§ 541.01, 541.-07(1) (1986). In *Schmitt v. Esser*, 178 Minn. 82, 226 N.W. 196 (1929), we set forth the general rule pertaining to accrual of claims for medical malpractice. In *Schmitt*, the plaintiff sued for medical malpractice, alleging the defendant physician failed to properly treat and heal a broken ankle. The physician treated the ankle from March 5, 1926, to July 1, 1926, and plaintiff commenced suit on June 5, 1928. This court rejected the defendant's contention that the two-year statute of limitations barred plaintiff's claim, holding "the treatment and employment should be considered as a whole, and, if there occurred therein malpractice the statute of limitations begins to run when the treatment ceases." 178 Minn. at 86, 226 N.W. at 197.

■ The circumstances surrounding Offerdahl's treatment raise a unique issue regarding the proper application of the "termination of treatment rule" set forth in *Schmitt* to a claim by a patient who received care as a patient of the clinic as a whole rather than an individual physician. The University asserts Offerdahl's claim against it is barred under the statute because more than two years passed between treatment by Dr. Felton, the resident who allegedly inserted the Copper–7 IUD without advising Offerdahl of the risks, and the commencement of the lawsuit. The University points out there is no evidence Dr. Felton rendered medical care or treatment to Offerdahl subsequent to the removal of the Copper–7 IUD in 1979. The University maintains any liability on its part is vicarious liability for negligence committed by Dr. Felton. Because Offerdahl's suit would be barred against Dr. Felton, the University argues the claim is barred against it as well.

In support of its position, the University cites *Grondahl v. Bulluck*, 318 N.W.2d 240 (Minn.1982). In *Grondahl*, the plaintiff

sued the defendant, Dr. Bulluck, and his clinic for failing to properly diagnose a malfunction of plaintiff's balance system. *Id.* at 242. The court remanded for determination when Dr. Bulluck's treatment of plaintiff terminated, noting that if the jury found the claims against Dr. Bulluck barred, the claims against the clinic would be barred as well, despite the fact that plaintiff had been treated by another doctor at the clinic within two years of the lawsuit. *Id.* at 244.

*Grondahl* is distinguishable from this matter. Unlike the defendant physician in *Grondahl*, Dr. Felton was not Offerdahl's regular treating physician at the time the Copper–7 IUD was inserted. Offerdahl testified in her deposition that she received treatment from several different University residents, apparently assigned at random, while receiving outpatient care at the University. In a very real sense Offerdahl hired the clinic and not an individual physician to treat or cure her problems.

We have not previously addressed the issue of applicability of the termination of treatment rule to a claim of a patient who received care from a clinic as a whole rather than an individual physician. In *Watkins v. Fromm*, 108 A.D.2d 233, 488 N.Y. S.2d 768 (App.Div.1985), the New York court held the termination of treatment doctrine tolls the statute of limitations for a medical malpractice action against physicians alleged to have committed malpractice while members of a medical group, but who have left group practice, provided the patient was treated as a group patient and the subsequent treatment was for the original condition or complications resulting therefrom. In so holding, the New York court noted the patient was "a patient of the group, rather than of any particular doctor, and had every right to believe that the group, as such, was, in effect, his physician, and that he could continue to be treated by that physician until either he or that physician ended the physician-patient relationship." 488 N.Y.S.2d at 775.

We adopt the reasoning of the New York court in *Watkins*. Offerdahl did not seek treatment from any particular University physician but employed the University clinic generally as her physician. We hold, under these unique facts where the patient sought treatment from a clinic as a whole rather than an individual physician, the treatment of the clinic as a whole, rather than that of the individual physician alleged to have committed the act of malpractice, is relevant for purposes of determining when treatment terminated and the statute of limitations began to run.

2. The next issue raised is whether the alleged negligence falls within the "single-act exception" to the termination of treatment rule. While the "termination of treatment rule" applies in most cases of alleged medical malpractice, we have recognized an exception to the general rule. In *Schmitt*, we stated:

> [I]t would seem advisable not to apply the bar of the statute on demurrer, unless it clearly appears from the complaint that the unskillful or negligent act which caused the injury took place at a date more than two years before the action was brought. It is true that, if there be but a single act of malpractice, subsequent time and effort to merely remedy or cure that act could not toll the running of the statute.

*Schmitt*, 178 Minn. at 84, 226 N.W. at 197.

In *Swang v. Hauser*, 288 Minn. 306, 309, 180 N.W.2d 187, 190 (1970), we applied this "single act" exception, holding the plaintiffs' claim for technical assault and battery stemming from allegedly unauthorized surgery was barred by the two-year statute of limitations despite the fact the physician-patient relationship continued within two years of commencement of the suit. We reasoned that "[t]he alleged tort was a single act of surgery * * *; that is, it was complete at that precise time, for no continued course of treatment could either cure or relieve it." *Id.* Similarly, in *Murray v. Fox*, 300 Minn. 373, 376–77, 220 N.W.2d 356, 358–59 (1974), we held a patient's claim for malpractice, alleging the physician was negligent in deciding upon and undertaking surgery, was barred by the statute of limitations despite other treatment within two years because the event of

alleged malpractice irrevocably occurred on the date of surgery and the statute of limitations began to run on that date.

 Offerdahl's claim similarly falls outside the general termination of treatment rule. Her claim alleges the University was negligent in failing to disclose to her the risks associated with the insertion of the Copper–7 IUD, and in failing to advise her that the Copper–7 IUD manufacturer recommended against inserting the IUD in patients, such as Offerdahl, who had a history of Pelvic Inflammatory Disease. Thus, Offerdahl's claim rests solely upon a single act or omission by the University in 1977, when the University physician inserted the Copper–7 IUD without informing Offerdahl of the risks.[1]

A practical reason for the general "termination of treatment rule" is that actionable treatment does not ordinarily consist of a single act or, even if it does, it is most difficult to determine the precise time of its occurrence. *Swang*, 288 Minn. at 309, 180 N.W.2d at 189. This concern is not present in this case, as Offerdahl has alleged an identifiable single act by the University as the basis for her negligence claim. Offerdahl's claim is in sharp contrast to the claim set forth in *Schmitt*, where the precise negligent event could not be readily identified. *See Schmitt*, 178 Minn. 83–84, 226 N.W. at 196.

Alleged negligence coupled with the alleged resulting damage is the gravamen in deciding the date when the cause of action accrues. *Dalton v. Dow Chemical Co.*, 280 Minn. 147, 153, 158 N.W.2d 580, 584 (1968). Offerdahl's allegation of negligence relates to acts or omissions by the University on August 9, 1977, the date the Copper–7 IUD was inserted. Under *Dalton*, her cause of action accrued when she sustained damage resulting from this negligence. Offerdahl sustained damage, and was aware of such damage, by January 28, 1979, when she was hospitalized for PID

and the Copper–7 IUD was removed. Because Offerdahl's cause of action accrued on January 28, 1979, and this action was not commenced until June 19, 1984, her claim is barred by the two-year statute of limitations set forth in Minn.Stat. § 541.07(1).

Reversed.

WAHL and YETKA, JJ., dissenting.

WAHL, Justice (concurring in part; dissenting in part).

I respectfully dissent from the holding of the majority opinion that Offerdahl's claim is barred under the "single act exception" to the "termination of treatment rule." In my view, the "single act exception" is inapplicable to the facts of this case. For that reason I would reach the issue and concur in the holding that, where a patient seeks medical treatment from a clinic as a whole, the treatment of the clinic as a whole is relevant for purposes of determining when the treatment terminated and the beginning of the statute of limitations period.

The general rule in medical malpractice cases is that the treatment "should be considered as a whole, and, if there occurred therein malpractice the statute of limitations begins to run when the treatment ceases." *Schmitt v. Esser*, 178 Minn. 82, 86, 226 N.W. 196, 197 (1929). Today, the majority departs from this long-standing rule by holding that Offerdahl's claim accrued, not when treatment ended, but when the "single act" of negligence and alleged damage occurred.

The majority attempts to draw support for its holding from our decisions in *Swang v. Hauser*, 288 Minn. 306, 180 N.W.2d 187 (1970), and *Murray v. Fox*, 300 Minn. 373, 220 N.W.2d 356 (1974). This reliance upon *Swang* and *Murray* is misplaced. Those decisions are distinguishable from the present case in that the previous cases involved a single act of surgery which was "complete at that precise time, for no con-

---

1. Recently, the Eighth Circuit Court of Appeals, applying Minnesota law, similarly concluded that a patient's claim for negligence, negligent nondisclosure and negligent misrepresentation against a physician and hospital regarding the insertion of a Copper–7 IUD was barred under the "single act exception" to the termination of treatment rule. *Goellner v. Butler*, 836 F.2d 426, 430 (8th Cir.1988).

tinued course of treatment could either cure or relieve it." *Swang*, 288 Minn. at 309, 180 N.W.2d at 190; *see Murray*, 300 Minn. at 376, 220 N.W.2d at 358. Thus, the claims stemming from unauthorized or unnecessary surgery, arose from easily identifiable single events. The single act exception should be limited to such cases.

Offerdahl's treatment, in contrast to the treatment giving rise to the causes of action in *Swang* and *Murray*, consisted of more than merely a single act. Her treatment contemplated, and in fact resulted in, ongoing contraceptive and gynecological care. Moreover, the damage resulting from the alleged negligence manifested itself over a period of time. Under these circumstances the termination of treatment rule applies.

This case is analogous to *Bush v. Cress*, 178 Minn. 482, 227 N.W. 432 (1929), where the plaintiff employed the defendant physician to "attend her in childbirth." 227 N.W. at 432. We held that plaintiff's claim, brought more than two years after the birth of the child, was not barred on the pleadings, as the complaint alleged the physician had treated plaintiff for conditions related to the childbirth within two years of the commencement of the lawsuit. *Id.* at 432.

Offerdahl sought treatment at the university for prevention of pregnancy. This treatment did not merely involve insertion of the Copper-7 IUD but also contemplated periodic follow-up visits for gynecological care. As noted by the court of appeals, the treatment Offerdahl received after the IUD was removed was necessary to relieve symptoms of Pelvic Inflammatory Disease, a condition she alleges was caused or aggravated by the presence of the Copper-7. Because the treatment for PID was the direct result of treatment for prevention of pregnancy, both treatments are relevant in determining the date upon which the statute of limitations began to run. I would affirm the decision of the court of appeals and remand this case for determination of the date of Offerdahl's last treatment for PID at the university.

YETKA, Justice (concurring in part, dissenting in part).

I concur in the view of Justice Wahl.