**FIRST TRUST COMPANY, INC., in its capacity as Indenture Trustee and not in its individual capacity, Respondent,**

v.

**The STATE of Minnesota, Appellant,**

**M.E.S. Corporation, Respondent.**

**AMERICAN FINANCIAL PRINTING, INC., Intervenor, Respondent,**

v.

**FIRST TRUST COMPANY, INC., in its capacity as Indenture Trustee and not in its individual capacity, Defendant in Intervention, Respondent,**

**State of Minnesota, Defendant in Intervention, Appellant,**

**M.E.S. Corporation, Defendant in Intervention, Respondent.**

No. C3-89-781.

Court of Appeals of Minnesota.

Dec. 26, 1989.

Review Denied March 8, 1990.

John C. Thomas and Jerome A. Miranowski, Oppenheimer Wolff & Donnelly, Minneapolis, for First Trust Co., Inc., respondent.

Hubert H. Humphrey, III, Atty. Gen. and Christie B. Eller, Asst. Atty. Gen., St. Paul, for The State, appellant.

B.C. Hart and Thomas J. Vollbrecht, Hart, Bruner & O'Brien, P.A., Minneapolis, for M.E.S. Corp., respondent.

Joseph M. Sokolowski, Minneapolis, for American Financial Printing, Inc., intervenor, respondent.

Heard, considered and decided by GARDEBRING, P.J., and FORSBERG and RANDALL, JJ.

## OPINION

GARDEBRING, Judge.

Appellant State of Minnesota challenges the trial court's grant of summary judgment in favor of respondent First Trust Company, Inc. (First Trust) in the amount of $1.7 million. We affirm the trial court's decision to grant summary judgment, but modify the amount of the judgment to $726,515.23.[1]

## FACTS

In 1983, the State of Minnesota instituted an energy conversion plan to replace current conventional gas-oil heating systems with a system that would burn wood, peat, and other alternative fuels at four state universities. This energy plan was intended as a cost saving measure in light of rising natural gas prices. In October 1983, the state sought proposals from various contractors for installation of an alternative system at St. Cloud State University, one of the universities selected for the project. The requests for proposals contemplated third-party financing of the project through the issuance of industrial revenue bonds.

In March of 1984, M.E.S. Corporation (M.E.S.) was awarded the contract for the St. Cloud State project. On June 21, 1984, the state entered into an energy services agreement with M.E.S.

The agreement provided for two types of compensation to M.E.S. The first type was based on the energy savings achieved by the new system. In addition to the "energy expense savings" payment, the state

---

1. Respondent has moved to strike a portion of appellant's reply brief. Due to our disposition of the case, it is not necessary for us to reach this issue.

agreed to make minimum monthly payments to insure financial stability for the project. The monthly payments were set at $42,736.19, plus $1.76/MLb of steam generated by the project. Pursuant to the agreement, the state was to commence making the monthly payments to M.E.S. on February 1, 1986.

The agreement also provided that its continuation beyond June 30 of any year was contingent upon continued legislative appropriation of funds, and further that failure by the legislature to make such appropriation was in no event to be considered a default by the state. The agreement also provided that the state would request the legislature to appropriate funds necessary to meet its payment requirements under the agreement.

In another section, the agreement said that payment of the minimum monthly payments was not subject to counterclaim or offset pending the outcome of arbitration or litigation.

On December 28, 1984, M.E.S. obtained financing for the project through the issuance and sale of City of St. Cloud industrial revenue bonds totaling $3.2 million. M.E.S. agreed to construct the new alternative fuel system at St. Cloud State and, in exchange, the city agreed to extend credit to M.E.S. from bond proceeds. The bond agreement appointed First Trust as the indenture trustee to protect the rights of bond purchasers by collecting and distributing the principal and interest due bondholders. As security for the prompt payment of principal and interest, M.E.S. assigned its right to receive monthly payments from the state to First Trust. The state consented to this assignment.

In May of 1985, the legislature appropriated $9 million for noninstructional expenditures to the State University Board for the fiscal year ending June 30, 1986, and $9.3 million for the fiscal year ending June 30, 1987. The language of the appropriations bill contains no reference to this project, nor does it spell out the uses to which the funds may be put. Rather, the funds are appropriated generally for "noninstruction-al expenditures." 1985 Minn.Laws, First Special Session; ch. 11, § 6, subd. 4.

M.E.S. had previously constructed an alternative fuel system at Bemidji State University, similar to the one planned for St. Cloud State. Operating problems developed with the Bemidji project, raising questions about the viability of the design for the St. Cloud State project. Additionally, the price of natural gas fell.

On March 27, 1986, the state unilaterally canceled the project. The state also notified M.E.S. that it did not consider M.E.S. in default on the agreement. First Trust, as indenture trustee, commenced this action against both M.E.S. and the state on July 29, 1986, seeking to recover payments due under the agreement. The state filed a cross-claim against M.E.S., asserting that the state was entitled to indemnification from M.E.S. as guarantor of the bonds.

Pursuant to the terms of the financing documents, First Trust accelerated payments due on the bonds resulting from the state's default. Bond proceeds held by First Trust totaling $1,739,164.01 were distributed to the bondholders on January 2, 1987. The outstanding principal balance remaining is $1,760,002.

The state agreed to request a $1.7 million appropriation from the 1987 session of the Minnesota legislature. The Senate Finance Committee, Educational Division, rejected the request. However, the House–Senate Conference Committee passed an appropriation providing the State University Board with the option of continuing to make interest payments on the bonds. The legislation ultimately passed provided that the appropriation did not constitute "a commitment or obligation by the state of Minnesota to make any payments on the principal * * *." 1987 Minn.Laws ch. 401, § 5, subd. 3.

In July 1987, the state's counsel noticed certain discrepancies in the payment and draw requests in connection with construction of the St. Cloud project. Following a criminal investigation by the Attorney General's office, the state determined that M.E.S. spent a portion of the funds intended for the St. Cloud project on the Bemidji

project. The investigation also uncovered overpayments made to the project's engineering consultant. Criminal charges were filed against John Briscoe, the president of M.E.S., but Briscoe was ultimately acquitted of the charges.

During the 1989 legislative session, the State University System included in its budget proposal a request for $2.37 million based upon an estimate of the potential liability for the St. Cloud Project. However, both the House and the Senate took action specifically rejecting that request. As enacted, the appropriation measure contains specific nonappropriation language addressed to this project. 1989 Minn.Laws ch. 300, art. 1, § 4, subd. 10.

On September 7, 1988, First Trust moved for summary judgment against both the state and M.E.S. M.E.S. moved for partial summary judgment against the state. The trial court denied M.E.S.'s motion against the state, but granted First Trust's motion. The trial court concluded that appropriations to the state college system in *both* 1985 and 1987 contained monies for energy costs. According to the trial court, the appropriated funds could be used to satisfy the state's obligation to make minimum monthly payments under the energy services agreement.

## ISSUES

1. Did the trial court correctly conclude that the 1985 state legislature appropriated funds which could be used to satisfy the state's monthly payment obligation under the energy services agreement?

2. Did the trial court err by concluding that the 1987 state legislature failed to discontinue appropriations for the purpose of making the monthly payments?

**2.** In July of 1985, Special Assistant Attorney General Gilbert S. Buffington, issued a letter opinion on behalf of the Attorney General, which stated in part:
> 1. The Energy Agreement has been duly and validly authorized, executed and delivered by the State of Minnesota (the "State"), is in full force and effect and is a valid and legally binding instrument of the State enforceable in accordance with its terms, except as the same

3. Did the trial court err by concluding that no genuine issues of material fact exist which would preclude granting summary judgment against the state?

## ANALYSIS

### Standard of Review

On appeal from a summary judgment, we review the record to determine whether any genuine issues of material fact exist, and whether the trial court erroneously applied the law. *Offerdahl v. University of Minnesota Hospitals and Clinics*, 426 N.W.2d 425, 427 (Minn.1988).

The state contends that the trial court erred as a matter of law by concluding that funds appropriated to the State University Board for noninstructional expenditures in 1985 and 1987 included money for energy costs associated with the M.E.S. project. Additionally, the state claims the trial court disregarded disputed material facts when it entered judgment. According to the state, factual questions concerning M.E.S.'s use of bond funds must be resolved before judgment can be entered.

### I. 1985 Legislative Appropriation

■ It is undisputed that the state and M.E.S. entered into an agreement pursuant to Minn.Stat. § 16B.16 (1984), which authorizes the state to contract for services intended to improve the energy efficiency of state facilities.[2]

However, the state contends that the energy services agreement could not bind it to make the disputed minimum monthly payments in the absence of a specific legislative appropriation for the project. The state correctly points out that the constitution prohibits payment of money from the state treasury "except in pursuance of an

> may be limited by bankruptcy, insolvency, reorganization or other laws relating to or affecting creditors' rights generally.
> 2. The Energy Agreement is in compliance with all applicable Minnesota state laws relating to contracts to purchase services intended to improve the energy efficiency of a state building or facility, including, but not limited to, Minn.Stat. § 16B.16, subdivision 1 (formerly 16.02, subd. 29).

appropriation by law." Minn. Const. art. XI, § 1.

Respondent claims funds have been appropriated by law to make the installment payments. Respondent argues that, in May of 1985, subsequent to the signing of the agreement with M.E.S. and to the issuance of the bonds, the legislature appropriated funds for noninstructional expenditures to the State University Board fiscal years ending June 30, 1986 and June 30, 1987. 1985 Minn.Laws, First Special Session, ch. 11, § 6, subd. 4. According to respondent, the funds appropriated for these noninstructional expenses encompass energy costs and the price of purchasing equipment to reduce energy costs, as contemplated in the M.E.S. agreement.

The state asserts that respondent's argument is precluded by *United States Fire Insurance Co. v. Minnesota State Zoological Board*, 307 N.W.2d 490 (Minn.1981). In *United States Fire*, holders of certificates of participation issued to fund acquisition of a zoo ride sought judgment against the state when the Zoo Board defaulted in April of 1980 on installment payments due under a contract for the ride. The board had been authorized by the legislature to acquire a ride under an installment contract. However, in a 1979 appropriations bill, the legislature specifically stated:

> All receipts from the zoo ride are appropriated and available until June 30, 1981 for the purposes of the zoo ride. *These receipts are the only money appropriated for zoo ride operating expenses or debt service.*

*Id.* at 493 (quoting 1979 Minn.Laws ch. 333, § 27) (emphasis added). In 1980, the legislature further declared that the authorization to purchase the zoo ride "did not constitute a direct or indirect obligation of the state * * * beyond net revenues generated by the system." *Id.* at 494 (quoting 1980 Minn.Laws ch. 614, § 14).

The supreme court rejected the certificate holders' claims, stating:

> [T]he state cannot be required to pay money from the general fund for the Zoo Ride unless and until the legislature appropriates funds for that purpose.

*Id.* at 496.

The facts in the instant matter differ significantly from the *United States Fire* situation. In the 1985 appropriations bill, there was a general appropriation of funds to the State University Board for noninstructional expenses, without language restricting their use or designating any other source of revenues for payment of energy costs. The supreme court has held that funds appropriated for general purposes may be used to cover any cost that falls within the scope of the authorization. *See Regan v. Babcock*, 196 Minn. 243, 253–54, 264 N.W. 803, 808 (1936). We hold that, in the absence of express nonappropriation language, funds appropriated by the legislature for noninstructional expenditures for fiscal years 1986 and 1987 encompass energy costs, and may be used to satisfy the state's minimum monthly payment obligation under the energy services agreement.

■ We must next determine whether authorization exists to expend the appropriated funds in the manner provided by the contract. Appellant contends that the statute limits the commissioner's authority to enter into contracts for energy efficient equipment. According to appellant, the commissioner may only contract to make such a purchase when, "the entire cost of the contract is a percentage of the resultant savings in energy costs." Minn.Stat. § 16B.16, subd. 1(a)(2) (1984). Thus, appellant argues, because no energy savings resulted from the agreement, the commissioner exceeded the authorization granted by the statute.

We reject this claim. Under the construction urged upon us by the state, no agreement could be considered valid until completed, and the state could cancel any agreement before completion and totally avoid liability. We do not believe this harsh result was intended by the legislature when it enacted the statute. *See* Minn.Stat. § 645.16(6) (1988) (court should examine the consequences of a particular interpretation when considering legislative

intent). Further, the statute specifically authorizes the commissioner to "spend money appropriated for energy costs in payment of a contract under this section." Minn.Stat. § 16B.16, subd. 1 (1984). Since we find that money appropriated for noninstructional expenditures may be spent for energy costs, we conclude that the commissioner was authorized to enter the energy services agreement and bind the state to make monthly payments until the legislature decided to discontinue appropriations for the project.

## II. 1987 Legislative Appropriation

■ The state next contends that the legislature clearly expressed its intent to discontinue funding for the St. Cloud project in the 1987 session. The state argues that it had the right to discontinue funding and cancel the contract under section 32 of the energy services agreement which provided that continuation of the agreement was contingent upon continued legislative appropriation for this purpose, and under Minn.Stat. § 16B.16, subd. 1(6) (1984), which allows the state to unilaterally cancel the agreement if the legislature fails to appropriate funds to continue it.

As support for its nonappropriation claim, the state points out that the legislature rejected a request for an appropriation of $1.7 million to cover the monthly payments due under the agreement. Rather than appropriate funds to retire the debt, the legislature agreed to pay $161,000 for interim interest payments on the bonds.

The state claims the language appropriating funds for interim interest payments manifests the legislature's intent to discontinue funding for the project. The legislation provides:

> This appropriation includes *interest costs for outstanding bonds and in no way constitutes a commitment or obligation by the state of Minnesota to make any payments on the principal* or the interest on the bonds or any associated fees or costs, nor does the appropriation constitute an admission or position by the state of Minnesota on the merits of any litigation arising out of an alleged de-

fault on the bonds or an alleged breach of any contract or loan agreement.

1987 Minn.Laws ch. 401, § 5, subd. 3 (emphasis added).

This enactment is similar to the nonappropriation language held sufficient by the supreme court in *United States Fire*. The language precludes the use of appropriated funds for payments on the principal due under the bonds. Had the legislature intended to allow the appropriated funds to be used to make minimum monthly payments under the contract, the language referring to interest payments would have been wholly unnecessary. We cannot adopt a construction of this legislation that would render a substantial portion of the language unnecessary. *See Gale v. Commissioner of Taxation*, 228 Minn. 345, 349, 37 N.W.2d 711, 715 (1949). Therefore, we conclude that this language and the rejection of the request for the deficiency appropriation clearly demonstrates the legislature's intent to discontinue funding for the project in the 1987 session, and that no appropriation has been made from which payments due after June 30, 1987, can be authorized. *See United States Fire*, 307 N.W.2d at 496–97.

Under the provisions of the energy services agreement and the controlling statute, Minn.Stat. § 16B.16, subd. 1(6) (1984), the state's obligation ended when the appropriation was not made. Accordingly, we modify the trial court's judgment by the amount of payments due after the end of the 1987 fiscal year, June 30, 1987.

## III. 1989 Legislative Appropriation

In 1989 the state legislature again clearly rejected budget requests to fund the agreement. The specific nonappropriation provided:

> Effective upon enactment of this act, no more money shall be paid out of the treasury of this state in connection with an agreement under Minnesota Statutes, section 16B.16, to provide a wood-fired boiler heating system at the campus of either Bemidji State University or St. Cloud State University. This prohibition is intended to be permanent.

1989 Minn.Laws ch. 300, art. 1, § 4, subd. 10.

Therefore, no state obligation existed for the 1990–91 biennium, either.

## IV. Offset

 Finally, the state argues that genuine issues of material fact exist concerning the application of monies disbursed from the bond fund by First Trust to M.E.S. The state claims that the factual questions concerning M.E.S.'s use of these funds are material to this action because if the bond funds were misused by M.E.S., the amount of the judgment will have to be reduced. The state essentially seeks to offset the amount it owes First Trust by amounts it claims M.E.S. misused.

First Trust asserts that the minimum monthly payments the state agreed to make are not subject to counterclaim or offset pursuant to Section 22(iii) of the agreement. That section provides:

> The State unconditionally agrees to make its Minimum Payments as provided in Schedule D. to this Agreement and such Minimum Payments are not subject to counterclaim or offset pending the outcome of arbitration or litigation in the event of a dispute concerning the Equipment or the Agreement * * *.

Consequently, First Trust claims the state's obligation to make the payments is independent of any claim it may have against M.E.S. for misapplication of bond funds.

We agree with First Trust. The state clearly waived any right to offset its monthly payment obligation in the contract. The state's duty to make monthly payments is not related to M.E.S.'s use of funds disbursed from the bond fund. Therefore, any factual issues which remain concerning M.E.S.'s use of bond funds are simply not *material* to this action. *See Rathbun v. W.T. Grant Co.*, 300 Minn. 223, 229, 219 N.W.2d 641, 646 (1974) (fact issue is material when its resolution will affect the outcome of a case).

We also note that an action is pending in the trial court between the state and M.E.S. M.E.S. will be required to answer questions concerning its use or misuse of bond funds in that action. Our decision in no way insulates M.E.S. from liability for the alleged misuse of funds in that action.

## DECISION

The trial court's decision to grant summary judgment against appellant is affirmed. The amount of the judgment is modified to $726,515.23.

Affirmed as modified.