## AMERICAN FAMILY INSURANCE, et al., Respondents,

v.

## NATIONAL CASUALTY COMPANY, Appellant.

### No. C0–93–2024.

Court of Appeals of Minnesota.

May 10, 1994.

Joseph B. Marshall, Marshall and Associates, P.A., Circle Pines, for appellant.

Robert J. McGuire, Katherine A. McBride, Cousineau, McGuire & Anderson, Chartered, Minneapolis, for respondents.

Considered and decided by HUSPENI, P.J., and PARKER and NORTON, JJ.

## OPINION

NORTON, Judge.

Appellant contends the trial court erroneously determined that appellant's insurance policy provided primary coverage for the defendant in a wrongful death action. The language and total intent of appellant's policy mandate coverage of the underlying claim. We affirm.

## FACTS

This appeal arises out of a declaratory judgment action to determine primary and excess insurance coverage for the defendants in a wrongful death action. Both appellant National Casualty Company (NCC) and respondent American Family Insurance provided coverage for Inez Thompson who operated a licensed daycare program in her Minneapolis home. NCC provided a family daycare policy; American Family provided a homeowner's policy which insured Inez and her adult son, respondent Brian Thompson, who lived with her.

On February 28, 1991, Inez was operating her daycare program. Shane Thompson, the 10-month-old grandson of Inez, was one of the children enrolled in the program. That morning, Brian asked Inez to make him a pot of coffee. Brian poured himself a cup of hot coffee and placed the cup near the edge of the kitchen countertop. Leaving the cup unattended, Brian left the kitchen and went to his room momentarily. Inez, who never saw the cup on the edge of the counter, was right outside the kitchen door throwing away a dirty diaper when Shane crawled into the kitchen, somehow reached up and grabbed the cup of coffee, and spilled it on himself. Brian was in his room when he heard the cup

hit the kitchen floor. Shane sustained first and second degree burns on his body. While in the hospital, Shane developed a bacterial infection in his lungs. As a result of these complications, Shane died on April 6, 1991.

Shane's parents brought an action against Inez and Brian Thompson. American Family provided the defense for Brian Thompson; NCC provided a defense for Inez Thompson. Inez cross-claimed against Brian for indemnification or contribution by his insurer, American Family. American Family tendered its defense of Brian Thompson to NCC. NCC declined the defense because, at the time of the accident, NCC did not consider Brian to be participating in the insured's activities as a daycare provider. American Family then brought this declaratory judgment action to determine which policy provides primary coverage of Brian Thompson. When American Family moved for summary judgment, the district court granted the motion, thereby determining that NCC is Brian Thompson's primary insurer.

### ISSUE

1. Is Brian Thompson excluded from coverage under the NCC policy?

2. Did the trial court err when it determined that NCC is Brian Thompson's primary insurer and that American Family provides excess coverage?

### ANALYSIS

**1. Coverage of Brian Thompson**

On appeal from summary judgment, this court must determine whether any genuine issue of material fact exists and whether the trial court erred when it applied the law. *Offerdahl v. University of Minn. Hosps. & Clinics,* 426 N.W.2d 425, 427 (Minn.1988). The interpretation of the language and intent of an insurance policy is a question of law which this court may examine de novo. *Garrick v. Northland Ins. Co.,* 469 N.W.2d 709, 711 (Minn.1991).

The relevant portions of NCC's "Family Day Care Providers Policy" include:

*FAMILY DAY CARE PROVIDERS POLICY*

Agrees with Insured, named in the declarations made a part hereof, that the business of the Insured is an association of member/providers licensed in the state of Minnesota to provide child day care services in their homes. Furthermore, in consideration of the payment of the premium and in reliance upon the statements in the application and declarations and subject to the limits of liability, exclusions, conditions and other terms of this policy:

*INSURING AGREEMENT*

**I. Coverage:**

To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury, property damage or personal injury arising out of the Insured's activities as a Day Care Provider.

\*      \*      \*      \*      \*      \*

**IV. Persons Insured:**

For the purposes of this policy the word "insured" means the day care provider named in the declarations, and any relative of the Insured or the Insured's spouse who resides in the same household, and any other person less than 21 years old in the household, in the care of the Insured.

\*      \*      \*      \*      \*      \*

**EXCLUSIONS:**

This policy does not apply:

\*      \*      \*      \*      \*      \*

(c) to bodily injury, property damage or personal injury except when directly arising out of the Insured's activities as a day care provider.

NCC argues that the policy excluded Brian from coverage because he was neither a "daycare provider" nor was he participating in daycare activities when Shane was injured. We cannot accept this restrictive construction of the policy language.

According to the specific language of the policy, NCC entered an agreement with the "Insured named in the declarations made a part hereof" to cover bodily injury "arising out of the Insured's activities as a Day Care provider." In this case Inez Thompson is that named "Insured." We take notice of the

fact that the policy differentiates between the "Insured" and an "insured." The definition of persons insured under the policy lists the daycare provider named in the declarations, here Inez, as the "Insured," and then lists other persons covered according to their relation to the "Insured." The policy covers "any relative of the Insured * * * who resides in the same household." That definition would include Brian Thompson, Inez' son. The policy also covers "any other person less than 21 years old in the household, in the care of the Insured." That definition would include Shane Thompson, a child in Inez' daycare program. While all of these persons are "insured" under the NCC policy, Inez, as the "Insured," is the paramount consideration here because her operation of the daycare invokes the coverage of the policy. Thus, although we review coverage of Brian Thompson in this appeal, we necessarily must focus our inquiry on the operation of the in-home daycare under Inez' supervision. We need only consider Brian in terms of whether he was an "insured" under the policy.

NCC admits that Brian is, by definition, an "insured" under the policy. NCC argues, however, that Brian Thompson is excluded from coverage because he was not participating in "activities as a daycare provider." In effect, NCC reads the policy to require an "insured" to be conducting daycare activities in order to be covered. We cannot accept such an interpretation. First, as we have discussed, the policy specifically distinguishes Inez, as the "Insured," from any other "insureds" under the policy. Second, NCC's logic would require us to plug in Shane's name where the "Insured" appears, and exclude him from coverage unless he were conducting the activities of a daycare provider. Such an interpretation and the result it reaches are nonsensical. The child was an "insured" under the policy simply by virtue of the fact that he was in Inez' daycare program. Similarly, Brian was insured because he resided in the same household as his mother and her daycare program; the policy does not require Brian to provide daycare services in order to be insured. Had NCC intended to cover only those persons providing daycare, it should have included that proviso in its definition of "persons insured."

NCC's policy is specifically designed to cover in-home daycare programs. A household incorporates a whole different dynamic into the daycare setting. The home presents different risks due to the layout of the building, the equipment and appliances that necessarily must be there to allow the household to operate, the extra people who live there but may not necessarily be directly involved with the daycare activities, all the activities that may occur in conjunction with daycare, and all the activities that may be completely independent of daycare and yet somehow affect the daycare service.

Given that environment, it makes sense for NCC to include as insureds a spouse and other members of the family who reside in the home, as well as all of the children in the daycare program. The policy is meant to cover instances such as the tragic situation underlying the claim in this case, where a child enrolled in daycare is injured in the daycare home. To exclude Brian Thompson because he was not a daycare provider would negate the purpose of having included him as an "insured" under the policy as a person who simply occupies the home. The district court properly determined that NCC provided coverage to Brian Thompson in this case.

This court has recognized the risks involved in home daycare in *National Union Fire Ins. Co. v. Republic Underwriters Ins. Co.*, 429 N.W.2d 695, 697 (Minn.App.1988). In that case, a young child was burned by a scalding pan while the daycare provider prepared lunch. *Id.* We determined that the National Union policy, which specifically covered the daycare program, covered that accident. *Id.* We focused our attention on the daycare provider's failure to supervise the child who was in her care, and concluded that the policy was intended to cover that very type of incident. *Id.*

A similar analysis is fitting here. We do not focus on Inez' act of making a pot of coffee or on Brian's act of pouring a cup of coffee. We focus on the fact that Inez was operating her daycare program that morning. She and Brian had just been playing

with Shane in the livingroom. Inez left the room to dispose of a dirty diaper. Brian went into the kitchen to get a cup of coffee. Both Inez and Brian knew Shane could crawl quickly, yet they left him unattended and he hurt himself. A daycare provider purchases insurance to cover injuries arising from this type of scenario.

## 2. Priority of Coverage

■ NCC next argues that the district court analyzed the policies under the wrong theory of law and erroneously concluded that NCC is the primary insurer. Again, we disagree. The two policies at issue contain conflicting clauses regarding "other insurance." Both policies contain "other insurance" clauses which govern in the event when more than one policy may apply to a claim. The NCC policy contains a "pro-rata" provision:

Other insurance: If the Insured has other insurance against a loss covered by this policy the Company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

The American Family policy contains an "excess clause:"

Other Insurance—Coverage D—Personal Liability. This insurance is excess over any other collectible insurance. However, if the other insurance is specifically written as excess insurance over this policy, the limits in this policy apply first.

A pro-rata clause conflicts with an excess clause. *Interstate Fire & Cas. Co. v. Auto–Owners Ins. Co.*, 433 N.W.2d 82, 85 (Minn. 1988). When faced with a conflict between pro-rata and excess insurance clauses, the court must determine which policy is primary. *Auto Owners Ins. Co. v. Northstar Mut. Ins. Co.*, 281 N.W.2d 700, 704 (Minn. 1979). In so doing, the court may analyze the total policy insuring intent by considering "the primary policy risks upon which each policy's premiums were based and as determined by the primary function of each policy." *Integrity Mut. Ins. Co. v. State Auto. &* *Cas. Underwriters Ins. Co.*, 307 Minn. 173, 175, 239 N.W.2d 445, 446 (1976). In the alternative, the court may consider the following criteria to determine which policy is closest to the risk:

(1) Which policy specifically described the accident-causing instrumentality?

(2) Which premium is reflective of the greater contemplated exposure?

(3) Does one policy contemplate the risk and use of the accident-causing instrumentality with greater specificity than the other policy—that is, is coverage of the risk primary in one policy and incidental to the other?

*Auto Owners Ins.*, 281 N.W.2d at 704. This court has acknowledged that the policy intent analysis is " 'broader' only in the sense that it involves more than a mechanical application of the three factors set out in *Auto Owners*." *Richardson v. Ludwig*, 495 N.W.2d 869, 874 (Minn.App.1993), *pet. for rev. denied* (Minn. Apr. 20, 1993).

■ NCC argues that this three-point test applies only to cases involving automobile insurance policies. On the contrary, caselaw reflects that the court must choose whichever test best assists in evaluating the policies and facts of each case. *See Auto Owners Ins.*, 281 N.W.2d at 703–04 (holding "closeness to the risk" doctrine is not limited to automobile insurance policies; applying this doctrine to boat insurance, and reversing trial court's determination which had not been based upon application of this doctrine); *see also Garrick*, 469 N.W.2d at 712 (court considered total policy insuring intent analysis to determine which of three automobile policies applied to an uninsured motorist); *Interstate Fire & Cas.*, 433 N.W.2d at 86 (court considered the total policy insuring intent to determine which policy covered the personal injuries sustained by a student in gym class); *Integrity*, 307 Minn. at 176, 239 N.W.2d at 447 (court applied intent analysis to determine which policy covered damages from an automobile accident); *Illinois Farmers Ins. Co. v. Depositors Ins. Co.*, 480 N.W.2d 657, 661–62 (Minn.App.1992) (court applied three-part test to determine which policy covered damages from automobile accident); *Nation-*

*al Union,* 429 N.W.2d at 697 (court applied three-point analysis to determine which policy covered injuries sustained by a child in a home daycare setting).

For purposes of our analysis here, we will evaluate which policy is primary by investigating the total policy insuring intent. *See Integrity,* 307 Minn. at 175, 239 N.W.2d at 446–47. The specific language of the NCC policy proposes to cover damages for injuries arising out of the operation of the in-home daycare center. NCC's primary risks are property damage and bodily injury that may arise out of daycare activities in the home. Inez Thompson paid a premium for that specific coverage. In contrast, American Family provides a general homeowner's policy that makes no reference to the heightened risks due to the presence of a daycare facility on the premises.[1]

The total policy insuring intent demonstrates that the NCC policy provides primary coverage in this case because it is closest to the risk. The district court properly determined that NCC provides primary coverage and American Family provides excess coverage.

## DECISION

In NCC's family daycare insurance policy, the "Insured" referred to daycare provider, Inez Thompson. Brian Thompson is also an insured under that policy. The language of the policy does not require Brian Thompson to participate in "activities as a daycare provider" in order to be covered. The accident occurred while Shane Thompson was in the daycare of Inez Thompson. The NCC policy is closer to the risk and thus provides primary coverage of Brian Thompson. American Family provides excess coverage.

**Affirmed.**

PARKER, Judge (dissenting).

I respectfully dissent. My reading of the policy language is that it unambiguously excludes liability coverage for a resident relative such as Brian unless he is acting as a day-care provider at the time his operative act is performed.

The majority opinion strains to avoid this exclusion by distinguishing between an *Insured* and an *insured;* the majority interprets the capitalized title to apply only to the primary (named) insured and the lower-case title to resident relatives. No authority is cited for this construction. The majority urges illustratively that if no such distinction is drawn, this would lead to the absurd result that the child himself would be excluded from coverage. But we are construing liability insurance coverage, and the child (or his representative) is a *claimant,* not one who is "legally obligated to pay * * * damages because of bodily injury."

The negligent activities of resident relatives in a home day-care operation are clearly foreseeable by a liability insurer. Surely the insuring risk is far greater if a liability policy provides coverage for the negligent acts of such persons causing injury to a child in the day-care program. The premiums assessed would necessarily reflect such broad coverage. To find such coverage by implication where the exclusion seems clearly designed to disclaim it imposes a considerable risk on an insurer, for which premiums presumably (in the light of the exclusionary language) have not been paid.

I would reverse and hold American Family to be the primary insurer by reason of its homeowner's coverage. Brian's operative act of negligence was to put down a cup of hot coffee within reach of a child while he was on the premises of a home day-care operation in which he was not employed. Such liability is typically covered by homeowner's insurance.

---

1. In addition, we note for the record that Inez Thompson had failed to disclose to American Family that she had been operating a daycare in her home.