**Geraldine GOELLNER, Appellant,**

v.

**Julius BUTLER, M.D., University of Minnesota, Appellees.**

No. 87–5078.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 3, 1987.

Decided Jan. 6, 1988.

Rehearing and Rehearing En Banc Denied Feb. 17, 1988.

**428**

Paula Goodman Maccabee, Minneapolis, Minn., for appellant.

David Hutchinson, St. Paul, Minn., & Paul Curtis Peterson, Minneapolis, Minn., for appellees.

Before McMILLIAN, JOHN R. GIBSON and FAGG, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Geraldine Goellner brought this medical malpractice, fraud and products liability action against Dr. Julius Butler, the University of Minnesota, and G.D. Searle & Company based upon infertility allegedly caused by insertion of a Copper 7 intra-uterine device immediately after an elective abortion. The district court[1] granted Butler and the university's motions for summary judgment and denied Goellner's motion for partial summary judgment, reasoning that Goellner's claims were barred by the statutes of limitations. We are satisfied that there is no genuine issue as to any material fact regarding the timeliness of Goellner's claims and affirm the district court's order. Fed.R.Civ.P. 56(c).

We recite the facts outlined in the district court opinion, which were based on the parties' affidavits and depositions.

On October 18, 1974 Geraldine Goellner had an abortion at the University of Minnesota hospital, which was performed by Dr. Julius Butler. On the day before the abortion, Goellner had a formal psychological screening interview with Carole Patterson, a nurse at the hospital. Goellner informed Patterson that she wanted to have another child some day and that she was considering the Copper 7 IUD (CU–7) or the rhythm method for contraception. Patterson gave Goellner two documents regarding IUD use. One of these stated that "[a]ll methods of birth control prescribed at our clinic, including the intrauterine device, have been carefully tested and are perfectly harmless." The other stated that "[i]ntrauterine devices do not impair fertility * * * but there are occasional instances of infection of the pelvic organs in women using this form of contraception." Goellner took these documents home and read them that night.

At the clinic, Goellner also read and signed two consent forms for the abortion, which described the procedure and the risks involved, and prescribed post-operative care. One of these forms stated that anything placed in the vagina for two weeks after the abortion could increase "the risk of post-abortal infection," and that "[i]f the womb becomes infected, it can lead to permanent sterility, loss of the uterus, or at least a long hospitalization." Goellner was given a copy of this form to take home.

The next day, immediately after the abortion, Dr. Butler asked Goeller if she wanted an IUD inserted, and Goeller consented. The IUD was then inserted. Goellner said that she had decided to use the Copper 7 IUD on the basis of the hospital's handouts and that she received no other information regarding the risks of IUD use.

Every Copper 7 IUD distributed to physicians and hospitals included a manufacturer's package insert stating indications, precautions, and adverse reactions reported

---

**1.** The Honorable Harry H. MacLaughlin, United States District Judge for the District of Minnesota.

with its use. The package inserts provided in 1974 stated that "[t]he CU-7 should not be inserted post partum or post abortion until involution [return of the uterus to normal size] has been completed." Dr. Butler testified that at the time he inserted the IUD he did not know that Searle advised against post-abortion insertion, because he had not read the package inserts. He did know, however, that insertion of an IUD could lead to infertility.

For a few days after the procedure, Goellner suffered bleeding and cramps. Several weeks later she began to experience abdominal pain and fever. On November 11, 1974, she went to the Spooner Clinic in Wisconsin, where her physician husband, a general practitioner, removed the IUD. Still experiencing pain two days later, she was admitted to Community Memorial Hospital in Wisconsin and treated with intravenous antibiotic therapy. She was released on November 16, 1983.

When the IUD was removed, Goellner's husband informed her that the Copper 7 had been expelled from her uterus and had lodged in the cervix. A note in Goellner's medical record indicated that the IUD had eroded the cervix, and Goellner admitted having read this note in November. Goellner testified that she was surprised at how painful the expelled IUD was and that its removal diminished her pain. Goellner suspected she might have a pelvic infection when antibiotics were required to treat her abdominal pain and fever.

Shortly after her release from the hospital, Goellner wrote Butler to ask "why [she] had had problems and whether it was because he had done the abortion incorrectly or put the IUD in 'wrong'." Butler wrote back and informed her that he had not performed either procedure incorrectly, that he was not responsible for her problems, and that "these things happen."

In about 1980 Mr. and Mrs. Goellner began to try to have another child, but were unable to conceive. On June 13, 1983,

Mrs. Goellner returned to the University of Minnesota hospital for fertility testing. She underwent a dye test which showed blockage of her fallopian tubes, and surgery which disclosed that the damage to her fallopian tubes was caused by pelvic infection. On July 29, 1983, she was informed of these results.

In late 1983 or early 1984, Mrs. Goellner listened to a program on Minnesota Public Radio about dangers associated with the Copper 7 IUD. The program stated that the Copper 7 should not be inserted at the time of an abortion. Goellner claims that this was the first time she was aware that her infertility may have been caused by insertion of the IUD in 1974.

On June 10, 1985, Goellner filed a complaint charging Dr. Butler and the University of Minnesota with negligence, negligent nondisclosure, and negligent misrepresentation.[2] Dr. Butler and the university moved for summary judgment on a number of grounds, including the statute of limitations. Goellner then added allegations of fraudulent misrepresentation and omission to her complaint, and moved for summary judgment on the issues of fraud and negligent nondisclosure. On January 13, 1987 the district court held that the statute of limitations barred Goellner's claim and granted the defendants' motions for summary judgment. The court also denied Goellner's motion.

In reviewing a district court's decision to grant a motion for summary judgment, we apply the same standard as the district court. *Mandel v. United States*, 719 F.2d 963, 965 (8th Cir.1983). Summary judgment should be granted only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We must view the facts in the light most favorable to Goellner, giving her the benefit of all inferences to be drawn therefrom. *Mandel*, 719 F.2d at 965.

---

**2.** The complaint also alleged six actionable wrongs by Searle which are not relevant to the present appeal. Searle was not a party to the motions for summary judgment and, by stipula- tion of the parties, the claims against Searle were dismissed with prejudice on August 15, 1986.

■ Goellner first contends that the district court erred in granting Butler and the university summary judgment on her claims of negligence, negligent nondisclosure, and negligent misrepresentation. In Minnesota an action against a physician or hospital for medical malpractice is barred if it is not commenced within two years of the date on which the cause of action accrues. Minn.Stat. § 541.07(1) (1986).[3] In most cases, the statute of limitations does not begin to run until the treatment for which the physician is retained terminates. *Murray v. Fox*, 300 Minn. 373, 220 N.W.2d 356, 358 (1974). However, this general rule does not apply when the actionable treatment consists of a single act. *Swang v. Hauser*, 288 Minn. 306, 180 N.W.2d 187, 190 (1970).

In this case the district court held that Goellner's claims were barred under either the single act or continuing treatment rule.

Goellner argues that her cause of action could not have accrued on October 18, 1974, the date of insertion, because she had suffered no injury at that time. She also claims that her treatment at the University of Minnesota continued until July 29, 1983, less than two years before she filed suit. Finally, she argues that the court's reliance upon cases applying the "single act rule" to surgery was misplaced, because in those cases some error in treatment was apparent upon its completion. *See, e.g., Murray v. Fox, supra; Swang v. Hauser, supra.*

■ Goellner correctly points out that the statute of limitations cannot begin to run on a negligence claim until damage has resulted. *Dalton v. Dow Chemical Co.*, 280 Minn. 147, 158 N.W.2d 580, 584 (1968). *But see Jewson v. Mayo Clinic*, 691 F.2d 405, 410 (8th Cir.1982). However, it is undisputed that by November 11, 1974, Goellner was suffering from a pelvic infection and that the IUD had caused erosion of the cervix. Each of these injuries was alleged to have resulted from the defendants' negligence. Goellner's cause of action therefore accrued on or by November 11, 1974, more than ten years before she filed suit. *Dalton*, 158 N.W.2d at 584. Thus, the district court's use of the single act rule, applied to the date by which damage had occurred, would bar Goellner's claim.

■ In addition, the district court's conclusion that the continuing treatment rule bars Goellner's claim is not error. Butler's only contact with Goellner was limited to the abortion and IUD insertion on October 18, 1974. His reply letter in late 1974 did not discuss further medication or treatment, nor offer Goellner any medical advice. It was therefore insufficient as a matter of law to establish a continuing course of treatment. *See Giles v. Sanford Memorial Hosp. & Nursing Home*, 371 N.W.2d 635, 637 (Minn.Ct.App.1985). Moreover, the fact that Goellner returned to the university in 1983 for fertility testing, some nine years after insertion of the IUD, is insufficient to establish a continuing course of treatment there. After October 18, 1974, Goellner did not seek follow-up care nor any advice from the university with regard to her abortion or the IUD. *See Jewson*, 691 F.2d at 409 (quoting *Schmit v. Esser*, 183 Minn. 354, 236 N.W. 622, 625 (1931)). She chose instead to receive such care from the Spooner Clinic, and the fact that she did not formally cease treatment at the university is immaterial. *Id. See also Krause v. Farber*, 379 N.W.2d 93, 96 (Minn.Ct.App.1985). *Cf. Offerdahl v. University of Minnesota Hospitals and Clinics*, 411 N.W.2d 20, 22 (Minn.Ct.App. 1987) (advising use of and undertaking to insert IUD constitute "isolated incident," or single act, for purposes of statute of limitations).

■ Finally, while Goellner may not have been aware of any injury on the date of the insertion of the IUD and unaware of the full extent of her injuries until 1983, these facts do not render the single act rule

**3.** Section 541.07(1) provides:
Except where the uniform commercial code or this section otherwise prescribes, the following actions shall be commenced within two years:

(1) * * * [A]ll actions against physicians, surgeons, dentists, other health care professionals * * *, and * * * hospitals, * * * for malpractice, error, mistake or failure to cure, whether based on contract or tort * * *.

or continuing treatment rule inapplicable to her claims. In the malpractice context, the Minnesota courts have expressly rejected the "discovery rule." *Johnson v. Winthrop Laboratories Division of Sterling Drug, Inc.*, 291 Minn. 145, 190 N.W.2d 77, 81 (1971). In the absence of fraud, ignorance of the existence of a cause of action does not toll the statute of limitations, *id.*, nor is it necessary that the ultimate damage be known or predictable, so long as some damage has occurred, *Dalton*, 158 N.W.2d at 585. Goellner argues that a number of products liability cases make the discovery rule applicable here. On the basis of our study of Minnesota law, we reject this argument. *See, e.g., DeCosse v. Armstrong Cork Co.*, 319 N.W.2d 45, 52 (Minn.1982) (en banc) (because of *unique* character of asbestos-related deaths, cause of action for wrongful death does not accrue until disease manifested in manner causally linked to asbestos).

We conclude that the district court did not err in finding Goellner's negligence claims barred as a matter of law under either the single act or continuing treatment rule.

Goellner argues in the alternative that even if her claims of negligence against Butler and the university accrued in 1974, they are preserved by Butler's subsequent letter, which fraudulently concealed operative facts underlying her claims.

 Under Minnesota law, fraudulent concealment occurs when a party against whom a cause of action exists prevents another "from obtaining knowledge thereof," and the statute of limitations begins to run "only from the time the cause of action is discovered or might have been discovered by the exercise of diligence." *Schmucking v. Mayo*, 183 Minn. 37, 235 N.W. 633, 633 (1931). In the presence of a fiduciary or confidential relationship, a false denial of knowledge or information by one who is in possession of the facts may result in liability, if its effect is to lead the potential plaintiff to believe "that the facts do not exist or cannot be discovered." *DeCosse*, 319 N.W.2d at 51 (quoting Restatement (Second) of Torts § 550, comment b

(1976)). In no case, however, is mere silence or failure to disclose sufficient in itself to constitute fraudulent concealment. *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 795 (1975), *cert. denied*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). The plaintiff's ignorance of a cause of action will not toll the statute, *Schmucking*, 235 N.W. at 633; and it is not necessary for the plaintiff to know the details of her cause of action. *Wild*, 234 N.W.2d at 795.

In this case the district court stated that Goellner had offered no evidence to show that Butler's statements that he had not performed the abortion incorrectly or inserted the IUD improperly were false or misrepresented anything to her. The court further recognized that Goellner did not assert that she asked Butler about the risks or side effects of IUD usage in the 1974 letter, nor that Butler made any representation about such risks or side effects in his reply.

On appeal, Goellner does not contend that Butler's letter contained any misrepresentations *per se*, but that Butler was "less than candid" with respect to the risks and possible consequences of IUD usage, *DeCosse*, 319 N.W.2d at 51, and that once he undertook to reply to Goellner's inquiry he was under a duty to tell the whole truth, *Swedeen v. Swedeen*, 270 Minn. 491, 134 N.W.2d 871, 877–78 (1965). She argues that Butler's letter, viewed in light of the other statements made to Goellner regarding IUD safety, lead Goellner to believe that the facts upon which her claims of negligence are based either did not exist or could not be discovered. *DeCosse*, 319 N.W.2d at 51.

 Goellner argues that Butler knew and failed to disclose in his letter that IUD's may cause pelvic infection and that pelvic infection may lead to permanent sterility. The record indicates that documents which Goellner admitted reading in consenting to the abortion and insertion of the IUD informed her that IUD's could cause pelvic infection and that pelvic infection could lead to permanent sterility. With these earlier disclosures, the district court was not in error in its determination

that Goellner had failed to establish fraudulent concealment by Butler. Moreover, we believe Butler's disclaimer of responsibility and his statement that "these things happen" were too general and indefinite to constitute actual misrepresentations of fact, *see Swedeen*, 134 N.W.2d at 874–75, and that they are therefore insufficient to form the basis for a claim of fraudulent concealment. *Normania Tp. v. Yellow Medicine County*, 205 Minn. 451, 286 N.W. 881, 884 (1939). We conclude that Goellner has failed to offer legally sufficient evidence of Butler's fraudulent concealment, and that her claims of negligence against Butler and the university remain barred.

Goellner's third argument is that the district court erred in ruling that her claims of fraud against Butler and the university are time-barred. She contends that a factual dispute exists as to when she discovered or should have discovered the facts underlying these claims, precluding summary judgment.

■ The statute of limitations applied by the district court provides that actions for fraud shall be commenced within six years "in which case the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud." Minn.Stat. § 541.05(6) (1986).[4] Such facts are deemed to have been discovered "when with reasonable diligence they should and ought to have been discovered." *Blegen v. Monarch Life Ins. Co.*, 365 N.W.2d 356, 357 (Minn.Ct.App.1985).[5] The plaintiff bears the burden of proof. *Id.*

■ Goellner claims the hospital's statements that IUD's "are perfectly harmless" and "do not impair fertility" were fraudulent. The district court concluded

that she knew she had been harmed by the IUD in November of 1974, alerting her to any fraud in these statements. Goellner began to experience abdominal pain and fever a few weeks after the IUD was inserted. On November 11, when her husband removed the IUD, she was informed that the IUD had been expelled from her uterus and had lodged and caused erosion of the cervix. She also knew that the subsequent need for antibiotics might indicate an infection in the pelvic area, and her letter to Butler indicated awareness that her problems may have been caused by the IUD. We therefore cannot conclude that the district court erred in its holding. The record makes clear that in November of 1974, Goellner was aware of sufficient facts to know she might have a fraud claim.

■ While the district court did not give more detailed treatment to the statement that IUD's do not impair fertility, the record before it demonstrates that here again Goellner should have discovered the alleged fraud. The document containing that statement, which was given to Goellner on October 17, 1974, also indicated that "there are occasional instances of infection of the pelvic organs in women using this form of contraception." The informed consent form for abortion, which was given to Goellner on the same day, stated that "[i]f the womb becomes infected, it can lead to permanent sterility * * *." Goellner testified that she read these documents on October 17, and relied upon them in deciding to have an abortion and to have the IUD inserted. This evidence was sufficient to place Goellner on inquiry regarding the safety of post-abortal IUD insertion.

Goellner's knowledge of the possibility of infection in November of 1974 followed,

---

4. Relying on *Krause v. Farber, supra,* the hospital and doctor argue that the two-year statute of limitations of section 541.07 is applicable to the fraud claims, as they are essentially malpractice claims with a different label. We are not expressly told that this theory was presented to the district court, and it is not necessary for us to go beyond the holding of the district court to affirm its judgment on this issue. We therefore leave clarification of this state-law matter to future development.

5. As Goellner correctly argues, fraud *itself* is judged with reference to the specific intelligence and experience of the aggrieved party, *Murphy v. Country House, Inc.*, 307 Minn. 344, 240 N.W. 2d 507, 512 (1976) (en banc), but the date on which fraud ought to have been discovered is subject to a standard of reasonableness. *Blegen,* 365 N.W.2d at 357.

and her subsequent letter to Butler conveyed her suspicion that the IUD may have caused her problems. Together with her knowledge of the potential consequences of post-abortal infection, this information was sufficient to put Goellner on notice that the IUD could have rendered her sterile, and that the hospital's statement that it would not do so may have been false. *See Blegen*, 356 N.W.2d at 358. Apart from her letter to Butler, however, Goellner did not take any action to determine the extent of her injuries; apparently she did not even ask those attending her at Community Memorial what had occurred or what its consequences might be. This was inconsistent with her duty of reasonable diligence. *Id.* We conclude that Goellner admittedly was aware of facts demonstrating the existence of her fraud claims by mid-November of 1974, and that the district court did not err in concluding that her claims are therefore barred.[6]

The parties also debate whether Butler and the university should be equitably estopped from pleading the statute of limitations in this case. In view of our disposition of Goellner's claims of fraud and fraudulent concealment, we do not believe that Butler and the university should be estopped from invoking their statute of limitations defenses. *Cf. Curry v. A.H. Robins Co.*, 775 F.2d 212, 218–19 (7th Cir. 1985) (applying analogous Illinois law); *Brenner v. Nordby*, 306 N.W.2d 126, 127 (Minn.1981) (finding evidence of inducement to delay suit and reasonable reliance thereon *after* cause of action accrued).

We conclude by observing that this case presents complex issues of state law and we give great weight to the decisions of an experienced district judge in such matters. *See Kansas State Bank v. Citizens Bank*, 737 F.2d 1490, 1496 (8th Cir.1984). We are not convinced that error has been committed, and we accordingly affirm the judgment of the district court.

---

6. The products liability decisions Goellner cites from other circuits are not to the contrary. For example, in *Allen v. A.H. Robins Co., Inc.*, 752 F.2d 1365, 1371 (9th Cir.1985), unlike the present case, the plaintiff "had no notice * * * that she might have suffered severe damage which could lead to sterility * * *" as a result of an IUD. In *Raddatz v. United States*, 750 F.2d 791, 793 (9th Cir.1984), the plaintiff's pelvic infection was not properly diagnosed or treated by the physician she visited for follow-up care. Her claims against the physician who actually inserted the IUD were barred under Idaho law. *Id.* at 796. Finally, in *Ballew v. A.H. Robins Co.*, 688 F.2d 1325, 1328 (11th Cir.1982), the court found that the plaintiff had made some independent effort to discover whether her problems were caused by the IUD, creating a genuine issue of fact as to her diligence.