**Karen Ann KLEMPKA, Plaintiff,**

v.

**G.D. SEARLE AND COMPANY, Defendant.**

Civ. No. 4–86–579.

United States District Court, D. Minnesota, Fourth Division.

June 26, 1991.

Michael Bruce Sokol, Sokol & Rudquist, Minneapolis, Minn., for Karen Ann Klempka.

Madge S. Thorsen, Paula Diana Osborn, Ann Marie Curme, Oppenheimer Wolff & Donnelly, Minneapolis, Minn., for G.D. Searle and Co.

Peter N. Thompson, Hamline University Law School, pro se.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Plaintiff Karen Ann Klempka[1] brought this action against defendant G.D. Searle & Company (Searle) for personal injuries she alleges were caused by Searle's Cu–7 intrauterine device (IUD) contraceptive. Diversity jurisdiction is alleged.

The complaint includes claims of negligence, strict liability, fraud, misrepresentation, breach of express and implied warranties, violation of Minn.Stat. §§ 325D.13, 325D.15, 325F.67 and 325F.69, and loss of services, consortium, and other damages.

Now before the court are several motions:

1) by Searle for summary judgment on the statute of limitations;

2) by Ms. Klempka for dismissal of affirmative defenses three (contributory negligence), four (failure to mitigate damages), nine (personal jurisdiction) and ten (venue), or in the alternative for summary judgment;

---

1. The plaintiff's current married name is Karen Erkes. She has not amended her complaint to reflect her new name. Her papers submitted for these motions use both names. For simplicity, she will be referred to here as Ms. Klempka.

3) by Ms. Klempka for partial summary judgment by application of collateral estoppel; and

4) by Ms. Klempka for a day certain trial setting.

Searle concedes dismissal of its ninth and tenth affirmative defenses (personal jurisdiction and venue) and neither side discusses the fourth affirmative defense (mitigation of damages). Otherwise each side opposes the other.[2]

## I.

The parties agree that the applicable statutes of limitation are either four or six years. They rely on different aspects of the factual background to support their respective positions as to whether the action is time barred.

Ms. Klempka had a Cu–7 inserted on October 15, 1976, by Dr. Tolomeo Ong, who had prescribed the device. The parties differ as to whether Dr. Ong told her about various risks associated with the Cu–7 before inserting it. Ms. Klempka does not recall being told of any such risks or side effects nor seeing the booklet provided by Searle to doctors to give to their patients containing information about the Cu–7. She states that no medical personnel ever told her about a risk of infertility associated with the use of the Cu–7. On the other hand, Dr. Ong states that he told Ms. Klempka before insertion about the risk of infection and that infection could lead to infertility.

Ms. Klempka experienced difficulties immediately upon insertion of the Cu–7, including pain and cramping. On October 27, 1976, she returned to Dr. Ong with complaints of continued cramping. She returned again on November 18, 1976, and Dr. Ong found a 3 × 4 centimeter adnexal mass on the right side ovary. An examination on December 3, 1976, confirmed that the mass was still present. After continu-

ing pelvic pain, she was examined on January 14, 1977, and the mass was measured at 4 × 5 centimeters.

On January 31, 1977, Ms. Klempka was hospitalized and her Cu–7 was removed during laparoscopy. At that time, the right side mass still measured 4 × 5 centimeters, a left side mass was found at 3 × 3 centimeters, and evidence of infection was present in the uterine cavity. Based on the surgical findings, Dr. Ong diagnosed chronic pelvic inflammatory disease (PID). He informed Ms. Klempka of this diagnosis and entered it in her medical records. She was treated with antibiotics and discharged from the hospital on February 4, 1977.

Of central importance to this case is the conversation between Ms. Klempka and Dr. Ong during this hospitalization. At her deposition, Ms. Klempka testified as follows:

Q. When's the first time you were ever aware of or heard the term "PID" or "pelvic inflammatory disease"?

A. Around the time of the IUD removal.

Q. Was it before or after you were hospitalized?

A. After.

Q. Tell me how you came to learn of that term.

A. Exactly what Dr. Ong had explained to me what happened.

Q. What did he tell you?

A. That he removed the IUD and also mentioned PID, also there was massive infection.

Q. Was this while you were still in the hospital?

A. Yes.

\*　　\*　　\*　　\*　　\*　　\*

Q. After the laparoscopy was completed, what did Dr. Ong tell you about

---

**2.** After the hearing on these motions, the court requested supplemental briefs from the parties on two questions:

(A) Under Minnesota law, was the cognizable physical manifestation of the disease or injury for which plaintiff seeks recovery chronic pelvic inflammatory disease or infertility?

(B) What was known by plaintiff at what point(s) in time in respect to any causal connection between the answer to Question A and the defendant's product, acts or omissions? Order, May 8, 1991. The parties have since submitted briefs responding to these questions.

what had happened and what he had observed?

A. He removed the IUD no problem, and there was massive infection in both tubes.

      \*    \*    \*    \*    \*    \*

Q. As you understand it, the IUD was removed only after Dr. Ong had performed the laparoscopy, correct?

A. Correct.

Q. Did Dr. Ong tell you anything about when this infection had started?

A. No.

Q. Did he tell you at all what was the cause of that infection?

A. As I understood, it was the cause of PID.

Q. Did he tell you what caused the PID?

A. The IUD.

Q. And he told you that in January of 1977 or early February of '77?

A. Say that again.

Q. When did he tell you that the IUD had caused the PID, at that time when you were in the hospital?

A. Yes.

      \*    \*    \*    \*    \*    \*

Q. Just so I'm clear, in late January—early February of 1977 Dr. Ong told you that you had pelvic inflammatory disease that was caused by the IUD, is that correct?

A. Yes.

Klempka depo. at 132, 146, 148, 235. Ms. Klempka has not offered any evidence to dispute this testimony.

To support her claims, Ms. Klempka states that she did not discover that the infection she suffered in 1977 resulted in sterility until after she was married and decided to try to have children. In 1981, she went to Dr. Ong regarding her fertility. A hysterogram performed on December 4, 1981, suggested blockage of her tubes. On August 16, 1982, a diagnostic laparoscopy and exploratory laparotomy were performed showing that Ms. Klempka's right tube was blocked and the left tube had adhesions. In 1983, she had artificial insemination performed with negative results. Dr. Ong referred her to Dr. Theodore Nagel at the University of Minnesota Hospitals in September 1984. Dr. Nagel diagnosed chronic PID, post-IUD use, and primary infertility. From October 1984 until December 1985, Ms. Klempka consulted with Dr. Linda Hammer–Burns regarding marital discord related to her infertility. She states that she first became aware of a possible claim against Searle at that time and that she contacted an attorney in June 1985 who conducted an investigation. She filed this action on July 21, 1986.

## II.

Searle argues that the complaint should be dismissed because the undisputed facts show that Ms. Klempka's cause of action accrued in early 1977 and all the statutes of limitation have run on her claims.

Ms. Klempka argues in her briefs submitted before the hearing that she only had a suspicion that her problems were related to the Cu–7 and that she did not have adequate information to make the connection between her infertility and the Cu–7 until she consulted with Dr. Hammer–Burns and her attorney in 1984 and 1985. In her supplemental brief in response to the questions posed by the court, she argues that at the time of the diagnostic laparoscopy and exploratory laparotomy performed on August 16, 1982, she first knew or should have known that she was diagnosed as infertile and that the Cu–7 may have been the causative agent. Plaintiff's supplemental brief at 5. She contends that the injury she sustained is in the nature of an infectious process which resulted in infertility, so that her cause of action for infertility did not accrue at the time the infection was diagnosed, but at the time she had sufficient information to know that she was infertile. Ms. Klempka also argues that fraudulent conduct by Searle should toll the statutes of limitations for all her claims until the time when she could reasonably have discovered the fraudulent acts, i.e., in 1984 or 1985.

## III.

■ On a motion for summary judgment, all material facts and inferences are construed in favor of the non-moving party. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). To defeat a motion for summary judgment, however, the non-moving party must show through specific evidence that there are material facts in dispute creating a genuine issue for trial; it may not rest only upon the allegations or denials of its pleadings. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

Under Minnesota law, which governs this case, the relevant statute of limitation for Ms. Klempka's negligence, strict liability, fraud, misrepresentation and statutory violation counts is six years. Minn.Stat. § 541.05. The breach of warranty claims are subject to a four-year statute of limitations, *see id.* The loss of consortium claim is derivative and not subject to a separate statute of limitations from the underlying tort claims, *see Kohler v. Fletcher*, 442 N.W.2d 169 (Minn.Ct.App.1989).

The critical inquiry on this motion based on limitations is whether Ms. Klempka's cause of action accrued in 1977, 1982, or in 1984–85, and, if in 1977, whether the statutes of limitations should be equitably tolled.

■ Under Minnesota law, two elements must be present for a cause of action to accrue for injuries related to a defective product: (1) a cognizable physical manifestation of the disease or injury, and (2) evidence of a causal connection between the injury or disease and the defendant's product, act or omission. *Hildebrandt v. Allied Corp.*, 839 F.2d 396 (8th Cir.1987), *Karjala v. Johns–Manville Prods. Corp.*, 523 F.2d 155 (8th Cir.1975), *Dalton v. Dow Chemical Co.*, 280 Minn. 147, 158 N.W.2d 580 (1968).[3]

■ Under Minnesota law, Ms. Klempka's cause of action for her injuries accrued by early February 1977. At that time, she had been diagnosed with chronic PID and she had been told by her doctor that she had PID and a "massive infection" in both tubes and that the cause of the PID was the inserted Cu-7. The cases cited by Ms. Klempka for a later accrual date involve situations where the injury was not yet manifest or where medical opinion was equivocal in connecting injury to a particular product. In the present case, the injury was manifest and the cause identified by February 1977. She argues that she was not aware of the full extent of her medical problems caused by the Cu–7 until after she tried to have children and discovered that she was infertile. She was diagnosed with chronic PID in 1977, however, and the delay in her coming to understand the consequences of the diagnosis are not attributable to any action or inaction by Searle.[4] As of February 1977, she could have pleaded a prima facie personal injury case.

In her supplemental brief, Ms. Klempka argues that the injury for which she seeks

---

**3.** Under the facts of this case, it does not appear that the court must decide whether Minnesota law should be characterized as a "discovery" rule. *Compare Hildebrandt*, 839 F.2d at 398 (describing the two elements set forth above as satisfying the discovery rule under Minnesota law) *with Goellner v. Butler*, 836 F.2d 426, 430–31 (8th Cir.1988) (limited use of discovery rule under Minnesota law). *See also Mack v. A.H. Robins Co.*, 573 F.Supp. 149, 151–54 (D.Ariz. 1983) (analyzing discovery rule for product liability injuries in various jurisdictions). The analysis in this case would be the same whether or not the Minnesota rule is characterized as a discovery rule. Searle does not argue that Ms. Klempka's cause of action for a defective product accrued at the time she was first injured regardless of whether she had any knowledge of the injury at that time. Searle argues that she

had already discovered her injury and its potential cause as of February 1977.

**4.** Dr. Ong testified that he knew the Cu–7 was associated with a risk of infection and that infection could lead to infertility. He also testified that he told this to Ms. Klempka before she agreed to use the Cu–7. Ong depo. at 288–89. She testified that she did not recall such warnings. Klempka depo. at 110–11. On this motion, the evidence must be viewed in plaintiff's favor so the history should be regarded as showing no warnings to her. The "learned intermediary" exception to the duty to warn provides that a manufacturer fulfills its duty to warn by adequately warning the physician, not the patient, of the Cu–7's potential risks. *See Kociemba v. G.D. Searle & Co.*, 680 F.Supp. 1293, 1305 (D.Minn.1988).

recovery is infertility and that infertility only develops over the course of time. She draws an analogy between her situation and that of plaintiffs seeking recovery for injuries caused by exposure to hazardous chemicals, *Dalton v. Dow Chemical, supra,* by exposure to asbestos, *Karjala v. Johns–Manville Prods. Corp., supra,* and by ingesting tetracycline, *In re Tetracycline Cases,* 729 F.Supp. 662 (W.D.Mo. 1989). She contends that her infertility resulted from a continuing tort by Searle, in that her infection known in 1977 was not manifest as infertility until there was medical confirmation of infertility in 1982.

This argument is unpersuasive. First, in her complaint, Ms. Klempka clearly states that the injuries for which she is seeking recovery include her pelvic infection. She alleges that she suffered "injuries including, but not limited to, the following: a series of infections of her uterus, fallopian tubes, ovaries and other parts of the pelvic region, necessitating the surgical removal of the Cu–7, *resulting in* permanent scarring and disfigurement and *sterility* to the Plaintiff...." Complaint at ¶ 8 (emphases added). This allegation is repeated under each count of the complaint. *Id.* at ¶¶ 13, 18, 23, 26, 29, 36. Her own pleadings establish that the injury for which she seeks recovery is the infection she alleges was caused by the Cu–7, and that sterility is one of aspects of "resulting" damages from this injury. She has not amended the complaint and cannot now claim that she is not seeking recovery for the injury of pelvic infection. *See Granahan v. Pearson,* 782 F.2d 30, 34 n. 8 (4th Cir.1985) (complaint alleging PID caused by intrauterine device states cause of action despite plaintiff's subsequent argument that she was not injured until she discovered she was infertile due to PID). Because she has admitted knowledge of this injury and a causal nexus between this injury and the product of Searle in 1977, her cause of action accrued in 1977 and is now time-barred.

■ Even if Ms. Klempka moved to amend her complaint to conform with her current position that her injury is infertility rather than pelvic infection, her complaint would be time-barred under the law. Her analogy to continuing tort cases is inapposite. In *Dalton* and *Karjala,* the plaintiffs' exposure to harmful substances resulted in latent disease which developed only after prolonged exposure. Defendants argued that the cause of action accrued at the time of first exposure, before the diseases had fully developed. Exposure continued during the development of the disease up to the time, years later, when suit was finally filed. In the present case, Ms. Klempka's exposure to the Cu–7 ended in 1977, at least five years before she was diagnosed as infertile and nine years before she brought suit. She was not subject to a continuing tort during this passage of time because the exposure had long since ended. The Minnesota Supreme Court recognized in *Dalton* that the continuing tort analogy is not applicable when exposure to the harmful substance has terminated years before commencement of suit. *Dalton, supra,* 158 N.W.2d at 585. Ms. Klempka has provided no evidence to support her theory that there was any cause of her infertility, or any effect of the Cu–7 on her reproductive capacity, other than her PID which was diagnosed in 1977. There is no basis to find any continuing tort by Searle.

Her analogy to latent injuries caused by tetracycline is also unpersuasive. In *In re Tetracycline Cases,* the plaintiff alleged that tetracycline had discolored her permanent teeth, but that this could not have been known until after her permanent teeth had erupted. The court held that her cause of action did not accrue until the injury, discolored teeth, was knowable, i.e., at the time of permanent tooth eruption. Ms. Klempka's case is different, however, in that she suffered a "cognizable physical manifestation" of her injuries in 1977 when she was diagnosed with PID. *See Hildebrandt, supra,* 839 F.2d at 398. There was no latency period between her exposure to the Cu–7 and her diagnosis of PID.[5]

---

5. Ms. Klempka's reliance on *In re Tetracycline Cases* is also misplaced in that the court there

Several courts, ruling under similar statute of limitations law in other jurisdictions have considered the theory of injury advanced by Ms. Klempka, and in each case the court has rejected the theory. In *Miller v. A.H. Robins Co.*, 766 F.2d 1102 (7th Cir.1985), the court affirmed dismissal of the complaint on statute of limitation grounds under circumstances very similar to here. In 1974, after two years use of the Dalkon Shield IUD, the plaintiff was diagnosed and treated for PID and the IUD was removed. In 1980, after getting married, she experienced difficulty becoming pregnant and, in 1981, she was diagnosed as infertile and told this was due to her PID in 1974, which was in turn due to her use of the IUD. She brought suit in 1981. At her deposition, she testified that her treating physicians had told her in 1974 that the IUD was a possible cause of her PID. The court held that this was sufficient under the Indiana discovery rule to mark the accrual of her cause of action and her claims were therefore barred by the Indiana two-year statute of limitations.[6] Ms. Klempka's testimony here is even stronger, for she testified that she was told at the time her PID was diagnosed that it had been caused by the Cu–7. As in *Miller* she had sufficient information to bring her claim against the manufacturer of the IUD at that time; she could not wait indefinitely until some future date when she was certain that her PID had resulted in infertility.

The same result was reached in *Gagnon v. G.D. Searle & Co.*, 889 F.2d 340 (1st Cir.1989), decided under New Hampshire law. Plaintiff had used Searle's Cu–7 for sixteen months when in March 1980 she developed various physical problems and a doctor removed the device. Thereafter, she developed PID and underwent a total hysterectomy in November 1981. She brought suit in September 1986. Under New Hampshire's six-year statute of limitations, the suit would be barred if her cause of action had accrued in March 1980. The court held that her action was barred because she testified at her deposition that in March 1980 she was aware that she was injured and that her injuries might have been caused by the Cu–7. The court stated:

> Even though in March 1980 [plaintiff] did not know with certainty the cause of her injuries or the full extent thereof, she clearly knew then that she was injured and that the injuries may have been caused by the Cu–7; under New Hampshire's discovery rule, that knowledge is sufficient to trigger the statute of limitations.

*Id.* at 343.[7] The plaintiff could not wait until the "full extent" of her injuries was known, including her total hysterectomy and consequent infertility. Here, Ms. Klempka has testified not only that she was aware that she was injured in 1977 but that she knew she had been diagnosed with PID, and that she had been told by her doctor that the PID was caused by the Cu–7. This was sufficient to trigger the stat-

---

found that the plaintiff had waited several years too long after her permanent teeth erupted to bring suit and granted summary judgment to the defendant on the basis of the statute of limitations. In quoting from *In re Tetracycline Cases,* Ms. Klempka stops short of the statement which follows the court's exposition of the discovery rule: "However, this rule does not protect the injured party who is dilatory in determining damages and cause. Just as statutes of limitations require a party to proceed with dispatch to press a claim, a party is and should be required to proceed diligently to find whether a claim exists." *Id.,* 729 F.Supp. at 665.

**6.** The Indiana rule is very similar to that followed in Minnesota. In Indiana, "the statute of limitations begins to run from the date the plaintiff knew or should have discovered (1) that she suffered an injury or an impingement, and (2) that it was caused by the product or act of another." *Miller,* 766 F.2d at 1103. In Minnesota, "two elements must be satisfied under the discovery rule before a cause of action accrues in cases involving injuries caused by a defective product: (1) a cognizable physical manifestation of the disease or injury, and (2) evidence of a causal connection between the injury or disease and the defendant's product, act, or omission." *Hildebrandt, supra,* 839 F.2d at 398 (cites omitted).

**7.** The New Hampshire discovery rule is similar to the Minnesota rule. Under New Hampshire law, "the statute of limitations is triggered when the plaintiff knows or should know " 'that he has been injured [and] that his injury may have been caused by the defendant's conduct.' " *Id.* at 342 (cites omitted). *Compare Hildebrandt, supra,* 839 F.2d at 398 (Minnesota rule).

ute of limitations. *See also Mack v. A.H. Robins Co.,* 759 F.2d 1482 (9th Cir.1985) (under Arizona's discovery rule, plaintiff's cause of action accrued when told by her doctors that IUD was the cause of her PID).

*Hildebrandt, supra,* upon which Ms. Klempka relies, is different from the present case. In *Hildebrandt,* the court reversed summary judgment granted on the statute of limitations. The case involved exposure to hazardous chemicals during a period of over twenty years. In reversing summary judgment, the court suggested that an earlier-filed case would have been found frivolous due to undiagnosed injuries and no evidence of causation linking the plaintiffs' symptoms to the defendant's products. In the present case, however, evidence of both diagnosis and causation was available by February 1977. The standards enunciated in *Hildebrandt* lead to the opposite conclusion under the undisputed facts of this case.

Although the consequences of these conclusions are unfortunate for Ms. Klempka, the policies underlying statutes of limitations are also important and would be undermined by not following developed precedents dealing with delay in bringing an action.

Ms. Klempka's claims for fraud and for equitable tolling of the statutes of limitations due to fraud also fail because she has shown no connection between the evidence of fraud she presents and the delay in bringing this action. Minnesota law provides that the statute of limitation for fraud does not begin to run "until the discovery by the aggrieved party of the facts constituting fraud." Minn.Stat. § 541.05, subd. 1(6). Assuming the truth of Ms. Klempka's evidence of fraud by Searle in the testing and marketing of the Cu–7, in this case she was told in 1977 that the Cu–7 had caused her to suffer chronic PID. She has not shown any connection between the fraud and her delay in bringing suit. Whatever fraud Searle may have committed before February 1977, at that time she had actual knowledge that she had been injured and had been told by her doctor that Searle's Cu–7 caused her injury. Her cause of action for fraud accrued at this time and the relevant statutes of limitation should not be equitably tolled.[8] This case is similar to *Gregory v. Honeywell, Inc.,* 835 F.2d 181 (8th Cir.1987), where the plaintiff alleged that the defendant had fraudulently concealed defects in its water heater from the public. The cause of action was based on the fact that the water heater had exploded, injuring the plaintiff. The opinion noted:

No plausible argument can be made, however, that Honeywell concealed the existence of this defect, if it existed, beyond the date upon which the defect caused the explosion at the [plaintiff's] farmhouse. The explosion itself fully apprised the plaintiffs that the water heater was unsafe, and enabled them to discover the full contours of the fraud and deceit of which they now complain.

*Id.* at 184. *See also Goellner v. Butler,* 836 F.2d 426, 431–33 (8th Cir.1988) (plaintiff's knowledge of injury and awareness that it may have been caused by her IUD sufficient for accrual of cause of action for fraud).[9]

8. The cause of action for breach of warranty accrued when the breach occurred, regardless of plaintiff's knowledge or lack of knowledge of the breach. Minn.Stat. § 336.2–725(2). A breach occurs "when tender of delivery is made." *Id.* Ms. Klempka's Cu–7 was "delivered" on October 15, 1976, the date of insertion. Although the statute of limitations for breach of warranty may be equitably tolled for fraudulent concealment, *see Kociemba, supra,* 680 F.Supp. at 1301–03, Ms. Klempka's knowledge in February 1977 of her injuries and her doctor's opinion as to their cause precludes equitable tolling here. Her claims for breach of warranty are barred.

9. Ms. Klempka argues that *Goellner* is inapplicable here because it concerned the accrual of a cause of action under the statute of limitations for medical malpractice, which is different from accrual for product liability. She is correct that these areas are different. *See Francis v. Hansing,* 449 N.W.2d 479 (Minn.Ct.App.1989). *Goellner* also involved a separate claim for fraud, however, as does the present case, and it is on point regarding accrual of a cause of action under the statute of limitations for fraud.

The same reasoning applies to Ms. Klempka's argument that Searle should be equitably estopped from asserting a statute of limitations defense. Dr. Ong told her his opinion in February 1977 that the Cu–7 had caused her PID. Her cause of action accrued in February 1977, and she has provided no evidence that any representation by Searle was relied upon by her or Dr. Ong in waiting to bring suit. *See also Gagnon v. G.D. Searle & Co., supra,* 889 F.2d at 343–44 (rejecting on the same grounds a similar equitable estoppel argument against Searle for fraudulent concealment); *Miller v. A.H. Robins Co., supra,* 766 F.2d at 1106–07 (same with regard to the IUD made by A.H. Robins Company).

Because the court concludes that defendant's motion for summary judgment should be granted, the other issues raised by plaintiff's motions need not be discussed.

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that the motion by defendant G.D. Searle & Company for summary judgment is granted, and the complaint is dismissed.

LET JUDGMENT BE ENTERED ACCORDINGLY.